**FRANCISCO v COLUMBUS (city) et**

Ohio Appeals, 2nd Dist, Franklin Co

No 2699. Decided June 7, 1937

B. G. Watson, Columbus, O. E. Davis, Columbus, and Clyde C. Beery, for plaintiff-appellee.

John L. Davies, Jr., Columbus. W. W. McCormick, Columbus, and M. L. Boyd, Columbus, for defendants-appellants.

## OPINION

By GEIGER, J.

The above entitled cause is now being determined on defendants' appeal on questions of law and fact from the judgment of the Court of Common Pleas of Franklin County, Ohio.

The action in the court below was one in equity, wherein the plaintiff sought an injunction restraining the City of Columbus, its Director of Public Safety and Chief Building Inspector from interfering with the operation of manufacturing activities in the building owned by the plaintiff and occupied, under lease, by the Columbus Washboard Company.

The trial court found in favor of the plaintiff. The cause is in this court for hearing de novo. By agreement of counsel, a bill of exceptions containing transcript of the evidence in the original hearing is presented as the sole and only evidence in this court.

The following short summary of facts will render understandable the nature of the controversy.

On or about May 4, 1920, the plaintiff, C. M. Francisco, constructed a small one-story factory building at 1016 Mt. Pleasant Avenue and on part of Lot 41, Phalan's Mt. Pleasant Addition. The size of the building was 24x100x10 ft. Its construction was under Building Permit No. 24922. After the construction of the building, plaintiff then engaged in the building of automobile heaters. On and after July 30, 1920, an addition to the first building was constructed under Permit No. 25727. The size of the addition was 28x56x12 ft.

The business had a very rapid growth and in the fall of 1923 a second addition was constructed under Permit No. 13948. This last permit was dated Ocober 31, 1923, and prescribed the size of the addition to be 32x110x13½ ft.

On August 6, 1923, there was duly enacted within the City of Columbus a Zoning Ordinance, which was very full and complete.

In this ordinance plaintiff's factory site was classified as being within a "First Industrial District." The character of this district was defined under §6 of the ordinance. On October 29, 1923, the city council enacted Ordinance No. 34515, changing the zoning map attached to the original zoning ordinance, and through which the Mt. Pleasant Avenue property of plaintiff was changed from a First Industrial District to an "Apartment House District." The Apartment House District was defined under §3 of the original ordinance and under its terms would not include the factory buildings of plaintiff as conforming.

At the time of the enactment of the original ordinance it would be very natural to expect that there would be in the various zones frequent instances of non-conforming properties. The city council in its enactment of the original zoning ordinance sought to provide for this situation under §10, which will be noted later.

By virtue of §10. plaintiff was entitled to and did continue the operation of his factory building at the Mt. Pleasant Avenue location until the fall of 1925.

By this time plaintiff's business had grown to the point that he needed much larger factory space.

A new site was purchased on Essex Avenue. This was approximately a mile and

a half distant from the Mt. Pleasant Avenue location. A new factory building was constructed of approximately twice the floor space of the original three units. Within a year or two it developed that this space was not adequate and a second unit was constructed at the new location of approximately the same size as the first. Plaintiff's business was described as being seasonal, meaning thereby that the sales of the heaters would be only in certain months of the year, and certain stock would be built up during the remaining months. The claim was made on behalf of the plaintiff that the requirements for storage space were in excess of that required as manufacturing space.

After the first unit at the new location on Essex Avenue was completed, the heavy machinery was taken from the Mt. Pleasant Avenue site and installed at the Essex Avenue plant. This was probably in October, 1925. It is the claim of counsel for the appellants that the removing of the equipment from the Mt. Pleasant Avenue location constituted an abandonment, as defined under §10 of the Zoning Ordinance. The following is the language relied on in said §10:

"A non-conforming use existing on August 6, 1923 (the date of passage of the zoning ordinance) may be continued until such time as there is an abandonment of such use by removal of equipment, alteration of fittings or change in the essential purpose of such use, the mere cessation of such use without such removal, alteration or change shall not constitute an abandonment."

Counsel for the respective parties in their briefs, in discussing the issue, use the following language:

"The sole question before this court is as to whether or not the non-conforming use of the premises located at Mt. Pleasant and Third Avenue was abandoned by Charles Francisco."

On behalf of plaintiff the claim is made that an abandonment may not be declared upon the mere removing of heavy machinery to their new location. Through plaintiff's testimony he presents the following picture:

His growing business demanded more space than could be provided at the Mt. Pleasant Avenue location. Following his estimated requirements, he constructed a new factory building at the new site of approximately double the capacity of the old site. Whether or not this capacity would be adequate, was necessarily in a measure speculative. The experience of a couple more years decided that it was not adequate and another unit was added of approximately the same size as the first unit on Essex Avenue. It is the claim of plaintiff and supported by his associates, that it was never intended to abandon the Mt. Pleasant Avenue site. It is claimed during the entire period they were using the Mt. Pleasant Avenue property for storage and at all times they had some one or more of the units filled to the roof. Plaintiff also presents testimony that by design they left a lot of their equipment at the original site so that the heavy machinery might be moved in and operation started upon twenty-four hours' notice. Included in the equipment left was the spot welding equipment, costing approximately $2000.00. Also there was left the enameling vats and equipment, together with the benches for assembly work; also electrical wiring of very heavy type. It was also presented in evidence on behalf of plaintiff that all of this equipment could have been advantageously moved and used at the new location. Witnesses for defendants controvert the character and quantity of equipment or materials left by plaintiff at the Mt. Pleasant Avenue factory after he moved to his new location. Several of them testified to the fact that it was entirely abandoned and that the boys in the neighborhood made a play house out of it; that the window lights were broken, the walls crumbled in and otherwise permitted to go to disrepair. After a time, one unit was rented for automobile painting. The date of this tenancy is not definitely determined. Some witnesses say a few weeks after the machinery was moved out; others that it was a year or more.

On April 8, 1927, plaintiff entered into a contract of lease for a period of four years with the Columbus Washboard Company. This new company started its manufacturing activities within a few months and has continued to so occupy and use parts of the building up to the time of the trial. The original lease only called for the one unit, the balance being retained by Mr. Francisco. According to the testimony, a second unit was added afterwards, for the Washboard Company.

While it is stated by both plaintiff and defendant that there is only one question involved, it may be necessary, in order to properly solve that question, to examine

the general policy and authority for municipalities in establishing zoning districts.

The general authority for enactments of this character is §3 of Article XVIII of the Constitution:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local policy, sanitary and other similar regulations, as are not in conflict with general laws."

The appropriate legislative enactment is found in §§4366-1, et seq, GC, under the heading "City Planning Commission." §4366-6 GC provides in substance, that when a planning commission certifies to the council a plan for the districting or zoning of the municipality according to the uses of buildings and other structures, then said council in the interest of the promotion of the public health, safety, convenience, comfort, prosperity, or general welfare may regulate and restrict the location of buildings to be used for trade, industry, residence or other specified uses, and for said purposes divide the municipality into districts. For each of such districts regulation may be imposed designating the kinds or classes of trades, industries, residences or other purposes for which buildings may be permitted to be erected, altered or used subject to specific regulations.

The ordinance of the City of Columbus, in which we are interested, was enacted on August 6, 1923, to which there were subsequent amendments. The amended ordinance as passed February 27, 1928, is in evidence, and recites that:

"Whereas, the council of the city of Columbus did on August 6, 1923, in the interest of the public health, safety, convenience, comfort, prosperity, and general welfare, duly passed an ordinance," etc.

In the case of Printz v Messer, 112 Oh St 628, it is stated by the court, on page 637:

"It is evident that these legislative provisions authorize the enactment of ordinances such as that involved herein. Furthermore, if such a legislative enactment had not been made, a majority of the court are of opinion that under the home rule provision of the Constitution (Article XVIII, §3) the regulation of the bulk, area, self-government and that therefore the municipality is doubly empowered to enact legislation upon this subject, having been given such authority both by the Legislature and by the Constitution."

That portion of §10 which is pertinent may be summarized as follows:

"A non-conforming use existing on August 6, 1923, (the date of passage of the zoning ordinance) may be continued until such time as there is an abandonment of such use by removal of equipment, alteration of fittings or change in the essential purpose of such use, the mere cessation of such use without such removal, alteration or change shall not constitute an abandonment. * * * A non-conforming use shall not be changed unless changed to a higher use. A non-conforming use if changed to a conforming use may not thereafter be changed back to any non-conforming use. For the purpose of this ordinance a use shall be deemed to be changed if changed from a use listed in one of the numbered subdivisions of §§2, 3, 5, 6, 7, and 8 to a use not listed in such subdivision; and such change shall be deemed a change to a higher use if the new use is a use that is listed in a preceding numbered subdivision."

"Use," by paragraph 4, §31, is defined as "application of premises or building, to a particular purpose."

By paragraph 6, "non-conforming use" is defined as one "that does not comply with the regulations of the use district in which it is situated."

By paragraph 7, it is provided that "An accessory use or building is a subordinate use or building customarily incident to and located on the same lot occupied by the main use or building."

It is asserted that the purpose of leaving equipment in the old factory was to enable plaintiff to resume the manufacture of automobile heaters at any time it was required, in the conduct of his business, and for the continued use as a storage place for heaters, and for such other uses as he might desire; that he had no intention of abandoning the use of the premises for "Manufacturing or Industrial use of any kind."

SECTION 10—NON-CONFORMING USES

The court below, in the interpretation of this section stated:

"Placing a strict construction on the ordinance there would be an abandonment as defined therein by reason of removal of equipment, but there cannot be such a strict construction as will deprive plain-

tiff of his property rights without due process of law without conflicting with his constitutional guarantees. * * *

"This makes it evident that there cannot be a strict construction of the ordinance, but that it must be liberally construed to avoid unconstitutionality."

In our judgment, such an interpretation of this section is not required, █ as would be a denial to the municipality of powers, the exercise of which are within the limits of the Constitution.

In the case of Village of Euclid v Realty Company, 272 U. S. 365, it is held:

"If the validity of the legislative classification for zoning purposes is fairly debatable, the legislative judgment must be allowed to control."

In speaking of the Constitution of Ohio, the court says:

"It is not necessary to set forth the provisions of the Ohio Constitution which are thought to be infringed. The question is the same under both Constitutions, namely, as stated by appellee: Is the ordinance invalid in that it violates the constitutional protection 'to the right of property in the appellee by attempted regulations under the guise of the police power, which are unreasonable and confiscatory'."

The court points out on page 390, that in reference to Zoning Ordinances which create and maintain resident districts, from 'which business and trade of every sort are excluded, the decisions of the state courts are conflicting, but those which broadly sustain the power greatly outnumber those which deny it altogether or narrowly limit it; and it is very apparent that there is a constantly increasing tendency in the direction of the broader view.

In **Printz v Messer**, 112 **Oh St** 628, it is held:

"Laws enacted in the proper exercise of the police power, which are reasonably necessary for the preservation of the public health, safety and morals, even though they result in the impairment of the full use of property by the owner thereof, do not constitute a taking of private property within the meaning of the constitutional requirements as to making compensation for the taking of property for public use and as to the deprivation of property without due process of law."

On page 638 it is stated:

"Under the police power society may restrict the use of property without making compensation therefor if the restriction be reasonably necessary for the preservation of the public health, morals, or safety. This is so. because all property within the state is held subject to the implied condition that it will be so used as not to injure the equal right of others to the use and benefit of their own property. Ruling Case Law, Volume 6, page 103."

"Now acts done in the proper exercise of the police power, which merely impair the use of property, do not constitute a taking of property for public use."

On page 639 it is stated:

"When, however, legislation does have a real and substantial relation to the prevention of conditions detrimental to the public health, morals, or safety, no matter how unwise the measure itself seems to individual judges, it is not for the judicial tribunals to nullify it upon constitutional grounds.

"The courts in such cases have no right to determine whether the measures questioned are wise or the best that might have been adopted. The courts can not hold such laws invalid upon the mere ground of inexpediency. In other words, the question of the reasonableness of this ordinance is one, in the first instance, for the determination of the council which enacted it."

In the case of **State ex v Stegner, 120 Oh St 418**, it is held:

"The provision of a zoning ordinance, limiting the subsequent addition, extension or substitution of business buildings or the use thereof, existing in a residence district at the time of the enactment of such ordinance, where it does not appear that such restrictions have no real or substantial relation to the public health, safety, morals or general welfare, is a valid exercise of the police power and is not violative of either the state or federal constitution."

In U. S. Supreme Court Advance Opinions. Vol. 81, page 455, Hotel Co. v Parrish, it is held:

"Regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process within the meaning of the provisions of the Fourteenth Amendment that no state shall deprive any person of life, liberty, or property without due process of law.

"Even if the wisdom of a statute be regarded as debatable and its effect uncertain, such matters are for the judgment of the legislature and not of the courts."

The ordinance itself (§26) provides that in interpreting and applying the provisions of this ordinance, they shall be held to be the minimum requirement adopted for the promotion of the public health, safety, comfort, convenience and general welfare. And further in the same section, it is provided that if there is conflict in this regard the provisions of this ordinance shall control. Violation of Constitution should clearly appear.

We may safely say that in the interpretation of ordinances passed under the police powers granted to cities by the Constitution, or by virtue of legislative enactment, that the ordinances are to be given a broad interpretation █ to effectuate the purpose of their passage, unless there is a clear violation of the Constitution, either Federal or State, and it is not competent for a court to limit these powers for fear of violating Constitutional rights which do not, in fact, exist.

## ABANDONMENT

There is a conflict of testimony as to the nature and extent of the non-user of the building after the plaintiff removed his active manufacturing to his new site. We are not concerned with the conflict of testimony on this point, for the reason that we feel that the case can safely be decided upon plaintiff's own testimony as to just what happened in relation to this property.

## GENERAL VIEWS

The plaintiff, under a permit from the city, erected certain buildings for his rapidly expanding business as a manufacturer of automobile heaters. During the course of his building, the zoning ordinances were passed, and his business, which, at the time of the passage of the first ordinance, was properly within a "First Industrial District," became a "non-conforming" business in an "Apartment House District." Plaintiff moved his factory out of the zoning district to the point where it has been since located.

It is asserted by plaintiff that, anticipating a possible emergency, which would require the use of the old plant, certain equipment was left in place. It is asserted that this equipment was of value, and

might have been used at the new plant, but for the fact that they desired it to be in place, so that it could be quickly used, in the event of necessity.

We can not agree with the proposition that there must be read into the ordinance as modifying the word "abandonment," the restriction "with the intention to abandon," or a similar intention that precludes a possible return.

Many of the cases that are cited are not apropos, and depend upon peculiar circumstances.

The Constitution giving the right to zone property in the interest of public health, safety, convenience, comfort, and general welfare, the city might and properly did attach certain conditions ameliorating the hardship that would arise upon the exercise of its rights; and provided that under certain conditions property that had been occupied for certain purposes that conflicted with the then general view of the welfare of the community, might continue to be occupied for "non-conforming" use.

This extension of leniency might be based upon a conception of fairness to those who had their money invested in a certain property, or simply through grace, extended to such persons, or upon a fear that failure to take such facts with consideration would render the ordinance unconstitutional.

Whatever might have been the actuating motive, the fact still remains that the main purpose of the ordinance was to establish for public welfare certain zones from which certain activities were excluded. The purpose of the city is clearly manifest, that upon the happening of certain events the right granted to remain within a zone from which the public was generally excluded, would be forfeited.

There is no necessity to supply a provision of the ordinance that these acts of forfeiture should not be effective unless they were intended to continue. If this were so, a zone never could be cleared of "non-conforming" activities, because all that the owner need do would be to have a mental reservation that under certain events he would return to his old location.

Even though it might be possible that an intention to abandon was necessary, in addition to the provisions of the ordinance, this plaintiff has continuously, since his removal, evinced an intention to abandon for the purpose of his own "non-conforming" activities. He left the place October, 1925, and has not since returned, or shown

any intention to return. Between 1925 and 1926 the place was absolutely vacant, except for the storage, and the present occupant did not enter the premises until 1927.

This hiatus of vacancy is sought to be covered by a mental reservation of ultimate return.

The purpose of the plaintiff at the present time seems to be to receive rent from the manufacturing concern which is willing to occupy the premises formerly occupied by him.

In the words of the philosopher:

"What you do speaks so loud that I can not hear what you say."

Section 10 provides that the "non-conforming" use may continue "until such time as there is an abandonment of such use, (1) by removal of equipment; (2) alteration of fittings; (3) change in the essential purposes of such use.

All these things are declared by the ordinance as a cause for forfeiture of his privilege.

The ordinance also provides that a "non-conforming" use shall not be changed unless changed to a higher use, and if changed to a "conforming" use, may not thereafter be changed to a "non-conforming" use.

· It is asserted that the storage of finished product falls within the definition of "accessory use," as defined by paragraph 7 of §31:

"An accessory use or building is a subordinate use or building customarily incident to and located on the same lot occupied by the main use or building."

The new manufacturing plant being located a mile and a half from the old, the use of the old could not be ▮▮▮▮▮ ▮ "accessary" to the new plant, because they are not on the same lot.

It will be observed throughout the whole ordinance that all accessory uses provided for are those that are incidental to the use of the same property that is classified within a certain zone.

It is not possible, under the ordinance, to locate a manufacturing plant outside of the zoned territory, and then consistently assert that certain uses incident to the plant may be claimed as an accessory use, in the zone which excludes the operation of the main plant.

However, we think this question is disposed of by the mere statement that an accessory use must be located on the same lot occupied by the main use or building.

A more difficult question presents itself in the correct determination of what shall be considered a "use" of a property.

The definition "application of premises or building to a particular purpose" is not very helpful. The question is—does manufacture or industrial operation of any kind permitted under paragraph 3 of §6, define the "use" to which the property may be dedicated? Or does the "use," as defined, mean the particular enterprise conducted on the property? Does paragraph 3 permit a property constructed and originally used for the manufacture of heaters, to be used for the manufacturing of washboards? Does §10 providing for the "abandonment" by the removal of equipment, mean that the equipment must be that used for a particular purpose such as manufacturing automobile heaters, or does it mean the removal of equipment that prevents the use of the property for any manufacturing purpose?

The case was tried, and the evidence introduced, on the theory that the "abandonment" related to the original activity, to-wit, the manufacture of heaters, and much of the testimony of the plaintiff is to the effect that the property continued under the favor of the section permitting "non-conforming" uses, by reason of the fact that there was the possibility of returning it to that particular line of manufacture, and to again use the property for its original purpose.

The broad view would be that it may remain within the protection of the ordinance, by reason of the fact that any manufacturing, including that of wash boards, would be within the classification, "Manufacture or Industrial Operation of any kind".

The question, however, is of no importance in this case, since the "abandonment" by removal of equipment, related to any manufacturing or industrial ▮▮▮▮▮ ▮ operations, because no manufacturing could be carried on unless there was equipment suitable for that purpose, and when the then suitable machinery was removed, and none other substituted, the "abandonment" for "Manufacturing or Industrial" purposes was complete.

It is urged by counsel, that our construction of the section would make it impossible for any manufacturing concern to take out any of its equipment for exchange

or temporary repair, without thereby rendering the property liable to lose its rights in the "non-conforming" zone. The answer to this, of course, is that the court having such a case before it would hold that no such interpretation could be given to the statute.

The removal of a piece of machinery for repair is not the removal contemplated by the statute. The removal contemplated is that the work then carried on can not be continued by reason of the removal of equipment to another position.

It is urged that the City Solicitor rendered an opinion contrary to these views. The solicitor states that the opinion was rendered on a different state of facts. However, this may be, we are not bound as a court by an opinion rendered by a city solicitor, because he happens now to be on the opposite side of the case, wherein his opinion is quoted against him.

We are of the opinion that the judgment of the Court of Common Pleas is erroneous, and that this court should enter a judgment against plaintiff-appellee, denying the injunction, with costs.

Judgment accordingly.

BARNES, PJ, and HORNBECK, J, concur.