Joseph Marchese and Samuel Monastero *v.*
Norristown Borough Zoning Board of
Adjustment.

Argued February 11, 1971, before President Judge BOWMAN, and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER, and ROGERS.

*Edward F. Kane,* with him *Bean, DeAngelis, Kaufman & Giangiulio,* for appellants.

*George C. Corson, Jr.,* with him *Wright, Spencer, Manning & Sagendorph,* for appellee.

*George C. Corson, Jr.,* with him *Frank X. Fornetta* and *Michael Alba* for intervening appellee.

OPINION BY JUDGE MENCER, May 10, 1971:

A nuisance may be merely a right thing in the wrong place—like a pig in the parlor instead of the barnyard.[1] Legally speaking, no nuisance is involved here; instead, this is an appeal from an Order of the Court of Common Pleas of Montgomery County affirming the Norris-

---

[1] Associate Justice SUTHERLAND, speaking for the court in *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388, 71 L. Ed. 303, 311, 47 S. Ct. 114, 118, 54 A.L.R. 1016, 1025 (1926), who stretched this analogy to reach the exclusion of apartments from single-family residence districts.

town Zoning Board of Adjustment and holding Joseph Marchese, the owner-appellant, had lost his right as a nonconforming user by reason of abandonment. Plainly speaking, the objectionable creature here is a one-story garage, forty-five feet by sixty feet, used for the storage and minor maintenance of trucks and contracting equipment and presently rented by appellant Samuel Monastero; the "parlor" is the residential area in which the garage is located at 816-818 High Street, Norristown, Pennsylvania.[2]

On February 26, 1968, Frank Tornetta and Michael Alba, residents of the neighborhood surrounding the garage, filed an appeal with the Norristown Borough Zoning Board of Adjustment seeking a prohibition of the use to which appellant Monastero was making of the garage. They claimed, under Article IV, Section 19(5) of the Borough Zoning Ordinance, that the nonconforming use of the building had been discontinued for a period of at least one year.

Following a hearing, the Board, on May 16, 1968, rendered a decision holding that it had not been definitely proven that the use of the property had been discontinued for a period of at least one year. It did hold, in keeping with Article IV, Section 19(4) of the

---

[2] The original Borough of Norristown Zoning Ordinance was approved by the Town Council on September 5, 1933, making the use nonconforming. Pertinent parts of the present Zoning Ordinance, amended and approved as of January 1, 1956, are as follows: "Article IV, Section 19. . . . 3. A nonconforming use of a building may be changed to another nonconforming use of the same or of a more restrictive classification. . . . 4. Whenever a nonconforming use of a building has been changed to a more restricted use or to a conforming use, such use shall not thereafter be changed to a less restricted use. 5. Whenever a nonconforming use of a building or portion thereof, has been discontinued for a period of at least one (1) year, such nonconforming use shall not thereafter be re-established, and the future use shall be in conformity with the provisions of this Ordinance."

Ordinance, that the original nonconforming use (daily parking and maintenance of contractor's trucks and equipment) had been changed to a more restricted use (the seasonal storage of specialty contracting equipment with infrequent minor maintenance work), and, therefore, permission for the less restricted use of daily parking and garaging of commercial vehicles was denied.

Appellants then appealed to the Court of Common Pleas of Montgomery County which, after argument before the Court en banc, by Order dated January 9, 1969, remanded the matter to the Board specifically for the taking of testimony concerning the operation of the garage during the period between February 1, 1960, and February 15, 1964, for a finding of fact as to whether or not the use during that period constituted an abandonment of the nonconforming use. Following the second hearing, the Board, on April 8, 1969, came to the following conclusions: "The Board has *weighed the evidence from both sides* and is of the opinion that the garages were *virtually abandoned* during the years 1962, 1963 and 1964. The testimony from the residents has convinced the Board that the garages were put to *no use at all* from the fall of 1961 until the Monastero trucks moved in on January 9, 1968. The Board therefore concludes that the owner lost his privilege as a nonconforming user by reason of abandonment." (Emphasis added.) Thereafter, the lower court in an Opinion and Order dated August 20, 1970, affirmed the decision of the Board and held that the owner lost his right as a nonconforming user by reason of abandonment. This appeal followed.

The appeal was heard in the court below upon the record made before the Board in the two hearings. The relative weight to be given the conflicting testimony in the record was a question for the Board as the triers of fact and may not be disturbed unless we should

find in our review that the Board abused its discretion or committed an error of law in arriving at its final decision.

The question of abandonment, being a question of fact, depends on a weighing of all the various factors present in an individual case. *See* Annot., 18 A.L.R. 2d 725 (1951). The essential facts of this case can be divided into five specific time periods:

*1920-1955.* In 1920, the garage (subsequently one garage with two smaller additions) in question was built by appellant Marchese's father who used the structure to house dump trucks and flat bed trucks and other equipment. The elder Marchese died in 1948 and his sons took over and extended the business to include bulldozers, loaders and some thirty-five trucks until, as Mr. Marchese testified, "The place got too small for us so we got larger quarters on Ridge Pike. We moved the majority of our equipment to Ridge Pike in 1955."[3]

*1955-February 1, 1960.* With the bulk of their equipment and business elsewhere in Norristown, Marchese Brothers used the garage for storage of "slurry-seal" trucks and other contracting equipment and did some repair work on the same "during the winter months when our outside work slowed up." During this period, at least one friend of the Marcheses stored some of his contracting equipment in the garage also.

*February 1, 1960—Autumn, 1963.* On February 1, 1960, Marchese entered into a lease agreement with Mobile Units Co. of Conshohocken, Pennsylvania, whereby the latter was to pay $150.00 per month rent to the former on a month to month basis. Mobile Units' intended use of the garage was termed in the lease as

---

[3] A sufficient indication of an intention to abandon a use has been found where machinery was moved to a new factory at a different location, even though a small amount of machinery was left for emergency use at the first location. *See Francisco v. City of Columbus*, 25 Abs. 422, 13 O.O. 404, 31 N.E. 2d 236 (1937).

"light industrial", and the company in fact began "installing ice cream equipment in trucks" (as the insurance policy taken out by Mobile Units described it) or an "assembly-fabricating type of thing" (as counsel for appellants dubbed it). Specifically, the garage was used to install refrigeration equipment, which the company obtained elsewhere, onto small ice cream vending vehicles owned in most instances by other individuals. The "Good Humor" type trucks would be brought to the garage by their owners, Mobile Units would install the refrigeration equipment within a few days, and then the trucks would leave the garage.

The lease allegedly continued until February, 1964, but there is ample testimony in the record that Mobile Units effectively ceased fabricating in late 1961 after approximately seven months of operation. Marchese received rent until June, 1963, whereupon Mobile Units went bankrupt in late 1963 or early 1964, finally "left" the garage about January, 1964, and may or may not have paid the total rent due to Marchese. There is some indication that Mobile Units left some equipment in the building until its final departure, and an insurance broker testified that he saw activity in the garage as late as 1962 and 1963. Marchese testified that Mobile Units was still in operation at the garage in 1963 if only by using the building for storage of a small ice cream truck or two which it had purchased and equipped in the hope of selling outright.

At least four persons, who either owned homes immediately adjoining the garage or who lived close by in the neighborhood, gave convincing testimony that Mobile Units left permanently after the summer of 1961 (the departure made poignant because a prominent member of the immediate neighborhood died in June, 1961, and activity by Mobile Units was not observed much afterwards); that after Mobile Units' departure "nothing whatever" was done with the build-

ing until January, 1968, when appellant Monastero moved in with the type of trucks and equipment unseen in the garage since 1955-1960; that salesmen and deliverymen frequently inquired of the adjoining neighbors where Mobile Units had gone and could be found; that the large entrance door of the garage was missing for a "couple winters" and that plywood protected the windows (this put forth by a neighbor who often backed into the once-used main driveway on his way to work); and that, despite the plywood, occasional repair work was done on the building because children had broken the garage windows.

*1964-1968.* The same neighbors were equally as emphatic that inactivity continued to reign over the garage until January, 1968. Consequently considerable testimony was put forth by Marchese and witnesses on his behalf (such corroboration having been absent as to the 1960-1964 period) that slurry-seal trucks, cement cutters, a distributor, a grass cutter, and other equipment were either simply stored in the garage or were the objects of repair efforts during the winter months of this period. Marchese insisted he never intended to abandon the garage, and that, in fact, he had to remove two or three trucks from the building so that Monastero could move in in January, 1968. There was also testimony that at least one friend of Marchese was again permitted to store his construction equipment in the garage.

*1968 to the present.* In January, 1968, Monastero moved into the garage with about six large hauling or dump trucks, "ten wheelers", and began storing them within the structure at night and repairing them when necessary.

As one resident described it, "High Street is a small, narrow street with no curbs or sidewalks and is inadequate for the parking and manipulation of large trucks in an area where people with small children live. The

trucks have difficulty in turning and backing into the garage without getting on someone's property. Small children must use this street in which to play and to travel to and from school."[4]

The entrance of this heavy-duty construction equipment into this residential neighborhood has caused parking problems and traffic jams; the early morning (about 6:30 a.m.) and late afternoon (about 5:30 p.m.) comings and goings of the trucks has created noise, disturbance, and fuel fumes; and one nearby neighbor even complained that the trucks caused her house to shake, the windows to break, and the plaster to crack. In addition, it seems that water from washing the trucks sometimes flows onto adjoining property.

Also, the local school principal came forward with the observation that, "It is my opinion that trucks and five-year-old children do not mix", and the President of the school's Parent Club voiced her discontentment at the renewal of construction equipment in the garage.

Pennsylvania generally has accorded a sympathetic and broad protection to activities which are nonconforming. Based upon the spirit of zoning enactments generally, the cases disclose the twofold purpose of the provisions in a zoning ordinance dealing with nonconforming uses, namely, to relieve the individual owners of avoidable hardship and at the same time to bring about as speedily as possible universal conformity with regulations of the zoning law.

Although appellants contend that the evidence does not justify a finding of abandonment of the nonconforming use and that the lower court was in error

[4] As Justice Musmanno said in *Cook v. Bensalem Township Zoning Board of Adjustment*, 413 Pa. 175, 178, 196 A. 2d 327, 329 (1963): "Only a poet astride a steed of resistless conjuration could visualize such a fleet of dump trucks and tractors as part of a domiciliary retreat, fitting into the picture of residential serenity unvexed by the noisy wheels of commercial enterprise."

in its application of the law of abandonment to the evidence of record, we feel that the decisions of the Board and of the court below should be affirmed.

There can be little doubt, after reading Article IV, Section 19(3) and (4) of the Ordinance, that at most the garage may be used for the more restricted use of "seasonal storage of specialty contracting equipment with infrequent minor maintenance work". When Marchese Brothers moved the majority of their business away from the garage and utilized it primarily for storage, they could not themselves return to the less restricted use, nor could they vest in a tenant the right to do so. By the very terms of the lease, the work by Mobile Units was "light industrial", which certainly was a less restricted use than mere storage and minor maintenance of seasonal equipment. Therefore, much like the bar and pawl of a ratchet, parts (3) and (4) of Section 19 permit motion in one direction only—toward conformity.

At stake, however, in the more important abandonment question, is the validity of the one-year provision in Article IV, Section 19 (5) of the zoning ordinance and whether the facts in the record justify a finding of abandonment. The following quotation from Ryan, *Pennsylvania Zoning Law and Practice*, §7.3.3 (1970), is apt: "Absent a Supreme Court decision which deals with the problem by holding rather than dicta, it would seem that a zoning ordinance could redefine abandonment in the manner suggested by Judge FLOOD [in *Null v. Zoning Board of Adjustment,* 10 D. & C. 2d 605, 606 (1956), aff'd. per curiam, 391 Pa. 51, 137 A. 2d 316 (1958) : "Our ordinance could no doubt provide that a discontinuance for a certain period is an abandonment or equivalent to an abandonment."] *if the time periods selected as establishing 'abandonment' were not too short, and the limitations were not applied in situations where the cessation of use was beyond the control of the*

*property owner.* Indeed, if it is desirable to allow non-conforming uses to 'phase out' [*Hanna v. Board of Adjustment,* 408 Pa. 306, 183 A. 2d 539 (1962)[5]], provisions which require the termination of a nonconforming use which has ceased for an extended period of time would seem sound. Any right can be lost, and there seems little purpose in protecting uses which have ceased for as long as the period involved in the *Null* case [twelve years, with no one-year provision in the applicable ordinance; here the Board found "no use" for over six years]." (Emphasis added.)

Also of interest are these words from Yokley, *Zoning Law and Practice,* §16.14, p. 282 (1965): "[C]andor compels the observation that the greater weight of authority, both early and late, sustains the right to bring the nonconforming use to its predestined terminal point, provided, of course, the termination provisions are reasonable as to time and directed toward some reasonable aspect of land use regulation under properly delegated police power. On more than one occasion . . . the Supreme Court of the United States has been called upon to review both State and Federal court decisions up-

---

[5] "A basic purpose of zoning is to ensure an orderly physical development of the city, borough, township or other community by confining particular uses of property to certain defined areas. With such a purpose nonconforming uses are inconsistent. Molnar v. George B. Henne & Co., Inc., 377 Pa. 571, 581, 105 A. 2d 325. The continuance of nonconforming uses under zoning ordinances is countenanced because it avoids the imposition of a hardship upon the property owner and because the refusal of the continuance of nonconforming use would be of doubtful constitutionality. Even though zoning ordinances permit the continuance of nonconforming uses, it is the policy of the law to closely restrict such nonconforming uses and to strictly construe provisions in zoning ordinances which provide for the continuance of nonconforming uses. Nonconforming uses, inconsistent with a basic purpose of zoning, represent conditions which should be reduced to conformity as speedily as is compatible with the law and the Constitution." 408 Pa. at 312, 183 A. 2d at 543.

holding the right to terminate nonconforming use, and has refused to intervene."

It is well settled that when an ordinance permits existing nonconforming uses in a district until "discontinued", or provides that whenever a nonconforming use of a building or premises has been "discontinued" or changed into a higher classification or to a conforming use such use shall not thereafter be changed to a use of a lower classification, the word "discontinued" is to be taken as the equivalent of "abandoned". *Upper Darby Township Appeal,* 391 Pa. 347, 138 A. 2d 99 (1958); *Haller Baking Company's Appeal,* 295 Pa. 257, 145 A. 77 (1928); *Upper Providence Township Appeal,* 414 Pa. 46, 198 A. 2d 522 (1964); *DeMeio v. City of Greensburg Board of Adjustment,* 49 West. 163 (1967); *Zoning Appeal of Killhour,* 10 Chest. 153 (1962); *Appeal of Slagle,* 22 Cambria 209 (1961).

As distinguished from mere discontinuance, the concept of the term "abandonment" includes the intention to abandon. Consequently, the abandonment of a nonconforming use and the consequent termination of any legal right thereto results from a concurrence of facts, circumstances, and the intention of the owner of the premises or other person entitled to the use. Intention with respect to the abandonment of a nonconforming use is to be ascertained from overt acts, or failure to act, as well as statements.

Decisions in cases dealing with the effect of the cessation or discontinuance of a nonconforming use naturally turn on the language of the particular ordinance or statute under consideration. *Landay v. Mac-Williams,* 173 Md. 460, 196 A. 293 (1938).

Since intention is a necessary element in the concept of abandonment, it follows that lapse of time is not *per se* decisive of whether a nonconforming use has been abandoned in the absence of a specific provision in the zoning ordinance. *See Null v. Zoning Board of Ad-*

*justment, supra; Elkins-Rydal Company v. Brigham,*
84 D. & C. 136 (1952); *Douglas v. Melrose Park,* 389
Ill. 98, 58 N.E. 2d 864 (1945); *Richards v. Zoning
Board of Review of Providence,* 100 R.I. 212, 213 A. 2d
814 (1965); *Stieff v. Collins,* 237 Md. 601, 207 A. 2d
489 (1965). But where, as here, a one-year time limita-
tion on the right to resume the nonconforming use is
imposed by the zoning ordinance, the intention to sur-
render the right is presumed *from the expiration of the
designated period.* Although because of this presump-
tion it becomes unnecessary to prove the intent to aban-
don after cessation of one year, it is still necessary to
show the concurrent overt acts or failure to act which
indicate abandoment.[6]

To our knowledge, the only Pennsylvania case which
has dealt specifically with a one-year time limitation
provision is *Elkins-Rydal Company v. Brigham, supra,*
where "a nonconforming use was lost by abandonment
when nothing was done to preserve it for over one
year", the zoning ordinance reading, "Abandonment.
If a nonconforming use of land or of a building ceases
or is discontinued for a continuous period of one (1)
year or more, subsequent use of such building or land
shall be in conformity with the provisions of this Or-
dinance. . . ."

We do not feel that the one-year limitation period is
unreasonably short, nor do we foresee injustice in giv-
ing rise to this presumption as long as this one-year
limitation is not applied in situations where the cessa-

---

[6] We do not go as far as New York where it has been held
that a clause prohibiting resumption of a nonconforming use after
discontinuance for one year obviates the necessity of proving actual
abandonment as well as the intent to abandon. *Town of Brook-
haven v. Capello,* N.Y.L.J., June 2, 1965, p. 22; *Jahn v. Town of
Patterson,* 23 App. Div. 2d 688, 257 N.Y.S. 2d 639 (1965).

tion of use was beyond the control of the property owner.[7]

Assuming the validity of the one-year provision, appellants contend that the lease agreement with Mobile Units between February 1, 1960 and February 15,

[7] As the lower court observed in its fifth footnote: "Absent some special circumstances such as those which existed in *Upper Providence Township Appeal*, 414 Pa. 46 (1964), where a nonconforming amusement park was sold at sheriff's sale to a bank, which under applicable banking law could not carry on the use, or those present in *Munhall Borough Council Appeal*, 175 Pa. Superior Ct. 320 (1954), where the owner made continuing efforts to secure a new tenant. In both cases, it was said that the failure to use the property in question for more than a year was involuntary and thus that the nonconforming use status was not abandoned despite a one-year, nonuser provision in the ordinance." Other decisions which have upheld zoning ordinances containing a provision that a nonconforming use shall terminate and may not be resumed if nonuse thereof shall have existed for a specified period, where the specified period seemed reasonable: *State v. DePledge*, 81 Abs. 463, 162 N.E. 2d 234 (1958) ; *Wilson v. Edgar*, 64 Cal. App. 654, 222 P. 623 (1923), (180 days held reasonable) ; *Landay v. MacWilliams, supra*, (by implication) ; *Beszedes et al v. Board of Commissioners of Arapahoe County*, 116 Colo. 123, 178 P. 2d 950 (1947) (nonuse for one year) ; *City of Binghamton v. Gartell*, 275 App. Div. 457, 90 N.Y.S. 2d 556 (1949) (dicta) ; *Franmor Realty Corp. v. LeBoef*, 104 N.Y.S. 2d 247, 201 Misc. 220, aff'd., 279 App. Div. 795, 109 N.Y.S. 2d 525, app. denied, 110 N.Y.S. 2d 910, 279 App. Div. 874 (1951) (in which the court discusses a number of cases upholding such provision) ; *State ex rel. Peterson v. Burt*, 42 Wis. 2d 284, 166 N.W. 2d 207 (1969) (where a nonconforming use had been continuously unoccupied and vacant for a period of at least one year, such use had been discontinued under the ordinance, and the city did not have to prove intent before ordering the discontinuance). Also *see State ex rel. Mortenson v. Brill*, 6 Wis. 2d 325, 94 N.W. 2d 691 (1959), aff'd on rehearing, 6 Wis. 2d 325, 96 N.W. 2d 603 (1959), in which the court held that the statutory protection of nonconforming uses extended only to the originally existing one, and that a 12-month discontinuance provision in a zoning ordinance was applicable to a nonconforming use substituted for the original in conformity with permissive provisions of the ordinance.

1964 (disregarding the period of disuse in excess of one year between February 15, 1964 and January, 1968), by its mere existence tolls the running of the one year limitation during the 1960-1964 period.

The right to continue a nonconforming use, once established and not abandoned, runs with the land and this right is not confined to any one individual or corporation. *Eitnier v. Kreitz Corp.*, 404 Pa. 406, 412, 172 A. 2d 320, 323 (1961). However, where a lessee is a tenant in name only, and the tenancy agreement in effect is a "hollow" lease, the mere existence of the lease without substance should not be heard to toll the running of the one-year limitation period and to freeze the nonconforming use indefinitely. Otherwise, in contradiction to the established objective of zoning to reduce nonconforming uses to conformity as speedily as possible in a constitutional manner, a straw man lease arrangement could unjustly and indefinitely prolong the life of a nonconforming use by means of a ploy —the landlord claiming no intention to abandon *ad infinitum,* and the tenant failing in point of fact to use the nonconforming use *ad nocumentum.* A hollow lease can also occur, as here, where a permissible nonconforming use is changed to an impermissible nonconforming use under a lease agreement, the landlord collects the rent payments without regard to whether the tenant is continuing the permissible nonconforming use, and the tenant in fact has discontinued even the impermissible nonconforming use and has permitted the building or use to be so dormant as to indicate abandonment. In such cases, the one-year limitation period should run, and the presumption of intent to abandon should arise after the expiration of one year.

The burden of proving abandonment or discontinuance is, of course, on those who oppose the resumption of the nonconforming use, but the owner, in his turn, may demonstrate that the facts and circumstances sup-

port the conclusion that the lease meant to toll the one-year limitation period was in fact fulfilled by a lawful continuation of the nonconforming use.

We note the apparent conflict with the Supreme Court's words in *Haller Baking Company's Appeal, supra.*[8] We distinguish the instant case because *Haller* involved the question of whether a particular use existed at the time of the adoption of the zoning ordinance, (i.e., what the "existing use" was at that time), whereas this appeal deals with the question of whether a nonconforming use has been abandoned. There is a substantial difference between determining whether a particular use exists at the time the initial zoning ordinance is enacted and determining whether a nonconforming use continues to exist or has been abandoned over a period of time since the ordinance enactment. The first examination is confined to one day, while the second, at least under the ordinance in this case, is limited to "at least one year", during which time, of necessity, close scrutiny is given to the "concurrence of facts, circumstances, and the intention of the owner". Indeed, the *Haller* decision, 295 Pa. at 260, 145 A. at 79, says, ". . . the ordinance indicates that a building's *capacity for use* is the determinative quality [which is the test on the day the zoning ordinance is enacted], not its *actual use* [which is the test over a period of time to ascertain if the nonconforming use has been continued or has been abandoned]." (Emphasis added.) Again, 295 Pa. at 262, 145 A. at 79, the court said *existing use* ". . . is not to be determined on the basis of actual or substantial use *on the date of the adoption of the ordinance.*" (Emphasis added.)

---

[8] "Neither the act, the ordinance nor the law generally requires the court to speculate as to the number of acts or business transactions necessary to constitute an existing use." 295 Pa. at 261, 145 A. at 79.

Moreover, where, as here, the Board chose to believe that there was "no use" made of the property for a period of time in excess of the one-year limitation, the court is not speculating "as to the number of acts or business transactions"; in order to speculate there would have to be *some* acts, whereas here there were *no* acts.

Even accepting appellants' contention that a fulfilled lease agreement existed between February 1, 1960, and February 15, 1964, such a less restrictive "light industrial use", as stated above, was not permitted under the ordinance. Certainly an unlawful use cannot toll the running of the one-year limitation period.

Nor is this a case of temporary cessation as the appellants contend. Granted, a temporary cessation, even for a lengthy period, *caused by circumstances over which the property owner had no control,* is generally held not to constitute proof of a discontinuance in the sense of abandonment within the meaning of zoning ordinance provisions since the circumstances themselves negate an inference of the necessary intention to abandon the use. Rathkopf, *The Law of Zoning and Planning* 61-9 (1960).[9] But here appellants had control

---

[9] Among the circumstances which the courts have held to excuse a cessation of use are the following: war, and the consequent restrictions imposed upon use by governmental authority; entry of the operator of the nonconforming use into the armed services; shortage of materials and supplies necessary for the continued operation of the nonconforming use; destruction of the property used for nonconforming purposes by fire; hurricane; flood; financial inability of the owner to continue in business; *inability to find a tenant desirous of using the premises for a purpose permissible as a nonconforming use;* a depression or a lack of activity in the owner's business or nonuse for certain months or seasons of the year caused by the fact that the particular use is seasonal; condemnation, or a taking by eminent domain; nonuse because of necessary repairs.

over the circumstances and, indeed, leased the premises for an impermissible purpose under the zoning ordinance.

. . Nor, as appellants contend, does the decision in *Upper Darby Township Appeal, supra,* apply here. Justice MUSMANNO said there, "Judge Ross of the Superior Court well expressed the principle involved here when he said in Williams Appeal, supra, 174 Pa. Super. at page 576, 102 A. 2d at page 189, that the 'natural growth' cases 'involve the situation wherein an humble use which existed when a zoning ordinance was adopted is expanded and intensified without modification of its original basic nature.' " 391 Pa. at 354, 138 A. 2d at 102. This is not a "natural growth" case.

Finally, "It is now well settled that zoning acts and ordinances passed under them are valid and constitutional as structural or general legislation *whenever they are necessary for the preservation of public health, safety, morals, or general welfare, and not unjustly discriminatory, or arbitrary, or unreasonable, or confiscatory in their application to a particular or specific piece of property*". (Emphasis in original.) *Lord Appeal,* 368 Pa. 121, 125-126, 81 A. 2d 533, 535 (1951). See also *Euclid v. Ambler Realty Co., supra; Best v. Zoning Board of Adjustment,* 393 Pa. 106, 141 A. 2d 606 (1958) ; *Bilbar Construction Company v. Easttown Township Board of Adjustment,* 393 Pa. 62, 141 A. 2d 851 (1958). For a one-year provision in a zoning ordinance to be validly applied, thus giving rise to a presumption of intent to abandon after the expiration of one year, the circumstances must indicate that its application complies with the above-quoted words of our Supreme Court in *Lord Appeal.* As for the instant case, the Norristown Zoning Board of Adjustment, after the first hearing in this case, decided "that to allow the daily parking and garaging of commercial vehicles on the captioned property would not be in

harmony with the general purpose and intent of the Zoning Ordinance of the Borough of Norristown and *furthermore would adversely affect the safety and general welfare of the surrounding community.*" (Emphasis added.)

The Board resolved questions of credibility in favor of the complaining neighbors, deciding that they were not aware that the garage was being employed for the conduct of a business. At least from the fall of 1961 until January, 1964 (and quite possibly until January, 1968), the garage at 816-818 High Street, Norristown, was "virtually abandoned" and "put to no use at all", for a period in excess of the one-year limitation. We find ample evidence in the record to support the Board's decision and find no abuse of discretion or error of law on their part.

Despite how appellants would have us style this building, the objections parleyed by their neighbors are well placed in fact and in law—the right to use the garage as a nonconforming use has been forfeited by reason of abandonment.

Order affirmed.

DISSENTING OPINION BY JUDGE MANDERINO:

The Norristown Borough Zoning Ordinance states that "whenever a nonconforming use of a building or portion thereof, has been discontinued for a period of at least one (1) year such nonconforming use shall not thereafter be reestablished, and the future use shall be in conformity with the provisions of this Ordinance." Borough of Norristown Zoning Ordinance, Art. IV, Section 19(5), 1956. Here, the majority affirms the decision of the Norristown Zoning Board and of the lower court that the evidence was sufficient to show an abandonment of the nonconforming use on the Marcheses' property for a period of at least one year.

Whether or not an abandonment has occurred is a factual question, but abandonment cannot be proven merely by a failure to use property for any given time. In deciding that a one story office building had not lost its right to continue as a nonconforming use, the Supreme Court in *Appeal of Township of Upper Darby*, 391 Pa. 347, 138 A. 2d 99 (1958), said that, "there is no evidence of *intention* to abandon the nonconforming use. No physical changes were made in the building, nor does it appear that its basic character was altered." (Emphasis added.)

Thus, it is evident that an *intention* to abandon a nonconforming use must be found before it can be concluded that abandonment has occurred. There was never any intention to abandon in the case of the Marcheses' property. The garage in question was built in 1922 to house trucks and other equipment. It became a nonconforming use in 1933 and continued to be used by the owners in the same way until 1960, when the garage was leased to Mobile Units Company. Mobile Units used the garage for the storage and installation of equipment on trucks and occupied the garage until January of 1964. The majority opinion indicates that Mobile Units may or may not have paid the total rent due to Marchese. However, nowhere is there any evidence to contradict the fact that rents were regularly received by Marchese from Mobile Units until their departure in 1964. Thereafter, the owners used the garage for storage until 1968 when it was rented to Monastero. This appeal is the result of an attempt to prohibit Monastero from using the garage to store his trucks.

It would be very difficult to assume an intention to abandon when there was never even any manifestation of abandonment. The garage in question has been used consistently since 1922 as storage for trucks and equipment. The fact that the garage may have been fuller or busier at some times does not justify the conclusion

that the times of lesser activity were an abandonment of the use, absent any intention or manifestation by the owner to abandon. The lower court erred in its conclusion that an abandonment had occurred.

The majority also claims that the Marcheses are greatly restricted in the use of their garage because of provisions of the zoning ordinance which state that "a nonconforming use of a building may be changed to another nonconforming use of the same or of a more restrictive classification" and that "whenever a nonconforming use of a building has been changed to a more restricted use or to a conforming use, such use shall not thereafter be changed to a less restricted use." Borough of Norristown Zoning Ordinance, Art. IV, Section 19(4), 1956. This claim is based on the assumption that the uses to which the garage was put first by Mobile Units, and secondly by the new tenant, Monastero, were less restricted than the use to which the garage was being put by the owners when it originally became a nonconforming use. Because the majority decides that these uses were less restricted than the original use, it concludes that they are not permitted under the above provisions of the zoning ordinance.

It is true that the ordinance clearly states that a nonconforming use may not be changed to another less restricted nonconforming use. However, there is no section of the ordinance defining these degrees of restriction. Thus, the decision of what is a more restricted use or a less restricted use is, at most, arbitrary.

It is possible that there could be legitimate classifications of what uses are more restricted or less restricted than others. However, to be valid, these classifications would have to meet two conditions: in the first place, they would have to be clearly spelled out in the zoning ordinance and secondly, they would have to have a rational basis. Since there are no such classifications spelled out in the Norristown Zoning Ordinance,

the references to "more restricted uses" and "less restricted uses" are meaningless.

In addition, it seems unlikely that the Borough of Norristown could introduce into its ordinance rational classifications of what is a more restricted use or a less restrictive use which would put the present use of this garage in a less restricted classification than the original nonconforming use. The attempt to draw a distinction between the original use of the garage by the Marcheses (the storage of trucks and equipment) and the use of the present tenant, Monastero (storage of hauling and dump trucks) is a mere academic exercise. In any event, the absence of *any* guidelines in the ordinance makes the determination that one use is more or less restricted than another completely arbitrary.

I would reverse the order of the lower court on the basis that there was never any abandonment of a valid nonconforming use and that the present use is a continuation of a permissible nonconforming use.