West Mifflin *v.* Zoning Hearing Board.
Strait et ux. and Crawford et ux. *v.* Zoning Hearing Board.

Argued October 19, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS.

*Richard G. Zeleznik,* with him *Mord C. Taylor, Jr.,* and *Ruby, Nescott & Taylor,* for appellants.

*John J. Kirk,* with him *Kirk, Lalama & Sheinman,* for appellee.

OPINION BY JUDGE MENCER, December 7, 1971:

These are statutory zoning appeals. We adopt the following general narration of those facts not in dispute:

"Prior to 1949, the Borough of West Mifflin did not have the benefit of a Zoning Ordinance. A 12-acre section of the Borough known locally as the McGowan Plan was then in existence. That section might be described as an older, built-up residential neighborhood, the residences constructed on 40-foot lots in the recorded McGowan Plan. Lots Nos. 37 and 38, fronting on McGowan Avenue, a 40-foot street, were each 40 feet wide and extended back 120 feet to an unopened 25 or 30-foot alley. These lots were vacant and for a time during World War II, had been used as a piggery. Some time during the [fifties], they were used for the parking of a single panel truck owned by a man employed in local industry, and who was also occupied as a part-time painter. There is some history of the parking of a dump truck on the subject lots thereafter. . . .

"On April 20, 1949, the Borough of West Mifflin enacted Ordinance No. 73, being its current Zoning Ordinance, and classified the subject 12-acre McGowan Plan as "B" Residential, consistent with the use then being made of the area, and to preserve its character as a Residential neighborhood, notwithstanding it was then surrounded on all sides by industry or the Union Railroad, a connecting railroad.

"On June 15, 1950, a predecessor in title to Lot No. 37, applied for a Building Permit to construct thereon a two-car frame garage measuring 22 feet by 20 feet.

The garage was erected a short time later. Still later, a single car garage was constructed on Lot No. 38 adjoining, without any municipal record of its origin.

"Not much more of any consequence happened until 1957 when a [Robert H.] Wilson acquired a tractor-trailer rig, and began to park it on the lots in question, then owned separately by his father and his aunt. In about 1967, [Richard W.] Wilson, his brother, also acquired a tractor-trailer rig, and began to use the same two lots for his parking. This trucking operation grew until there were [at] one time four tractor-trailer combinations on the two lots in question, which had a combined measurement of eighty feet by one hundred twenty feet and fronted on McGowan Avenue, a 40-foot dead-end street. In 1966 the residents in the area began to put pressure on the West Mifflin Borough Mayor, Police, and Council Members by numerous complaints about welding, sandblasting, painting, loud and continuous engine operation, noise, and fumes originating from the parking and repairing of trucks on these lots. The complaints further alleged the operations of a business in a residential area and demanded that the Zoning Ordinance be enforced. The chief complainants were John and Madelyn Strait, who had owned adjoining Lot No. 39 since 1948, and who had constructed thereon a new brick dwelling in 1949 and 1950, prior to the trucking operations and also prior to the construction of the first of the automobile garages thereon. During 1967, 1968, and 1969, several notices were sent by two successive Borough Solicitors and the Borough Secretary advising the Wilsons of their violation, and directing that they discontinue. The Wilsons diminished their activities to some extent and the complaints subsided. However, early in 1969, the Borough Zoning Officer and Building Inspector again visited the site after renewed complaint, and made a formal determination that the two Wilson brothers were in violation of

the Zoning Ordinance and ordered them to discontinue or face prosecution. The Wilsons appealed this decision to the Zoning Hearing Board, seeking a variance or special exception, and a hearing was held on May 26, 1969, in the Municipal Building after public notice. At that hearing, the Wilsons were represented by counsel and testimony was taken and transcribed. A petition in opposition to the parking and repairing of trucks on the two lots containing 37 signatures was presented and accepted. On July 8, 1969, the West Mifflin Borough Zoning Hearing Board, by a two member majority, sustained the Wilson Appeal, and made findings and conclusions to support their action. A dissent was filed by the third member. Neither variance nor special exception was granted as applied for, but the determination was based on a finding of a prior nonconforming use, as well as a provision in the Zoning Ordinance pertaining to land abutting an operating railroad.

"The Mayor and Councilmen, who were familiar with growth and development in that area from times antedating the Borough Charter, disputed the determination made by their own Zoning Hearing Board on the basis of personal knowledge, and directed that the Solicitor have the matter reviewed by the Common Pleas Court. Zoning Appeals were filed by both the Borough and four of the individual complainants, and the cases were consolidated for a hearing [de novo] which was held on November 5, 1970 in the Courtroom of Judge Benjamin LENCHER. On February 4, 1971, Judge LENCHER handed down his Order dismissing both Zoning Appeals and upheld the action of the West Mifflin Borough Zoning Hearing Board."

More specifically, Richard Wilson (Richard) graduated from high school in 1947 at which time he bought the above-mentioned dump truck from his uncle and began "hauling slag from Duquesne Slag in Buttermilk

Hollow."[1] His uncle regained possession of the truck in 1951, the year Richard went into the service, and the vehicle was sent to Alabama to Richard's cousin who was doing construction work there. How much hauling Richard did with the dump truck between 1947 and 1951 (more particularly between 1947 and April 20, 1949) is unclear from a reading of the record. It is clear, however, that his uncle sent the dump truck away and used the panel truck for part-time painting jobs (the panel truck was stored in one of the small garages on the lots). The Zoning Hearing Board and the court below evidently decided that a prior nonconforming use was established on the basis of this 1947-1951 activity.

After his discharge from the service in 1955, Richard worked for a short time at the Irvin Works of the U. S. Steel Corporation near his McGowan Plan home, then he worked a short time for "Clark Chevrolet", and then he "was a sawsmith for fourteen years" with Davis Saw & Knife Company. Then, "I bought a truck three years ago [1967], just as a hobby, and I didn't start in the trucking business until two years ago [1968]." During the years 1956 to 1961, he moved to and resided in Duquesne, Pennsylvania. "Q. But your personal use of this property, as you related here in this Court, only commenced two years ago [1968]? A. No, I said my personal use of this property for trucking business—but I helped Bob and I had a pickup truck, even when I lived in Duquesne, because there was no place to park it in Duquesne, and I helped my uncle all the time. He was a painter." (R. 55a)

---

[1] "[Richard Wilson answering] I was hauling this batch and that, so every night I would have to come home and hammer the cement out where it would get hard and if it needed repaired, I repaired it.

"Mr. Zeleznik: What year?

"The Witness: It was 1947, when I graduated from high school, until 1951 when I went to the service." (R. 37a)

Meanwhile, Robert Wilson, who is two years younger than Richard, went into the service sometime after his brother did, because "I got out of the army in late '57 and a month later I bought the [tractor-trailer] truck. When Dick went in the army, I was too young to drive and when he got out, he had his pickup truck and we made money with those trucks." (R. 111a)[2]

Our review, under the circumstances, is limited to the question of whether or not the court below committed a manifest abuse of discretion or an error of law. *Archbishop O'Hara's Appeal,* 389 Pa. 35, 131 A. 2d 587 (1957); *Volpe Appeal,* 384 Pa. 374, 121 A. 2d 97 (1956).

Initially, we note that the parking of the panel truck is immaterial because its primary use was merely in conjunction with part-time painting jobs—a completely different use from that under discussion. The fact that two small garages occupy the lots is also immaterial because neither garage was built until after passage of the ordinance, and because they are admittedly too small to have housed the original dump truck, leastwise the present tractor-trailers.

We think it reasonable (and there is sufficient evidence in the record, see note[1], *supra*) to conclude that a nonconforming use was established by Richard Wilsons' 1947-1951 hauling operations. The real issue, however, is whether this nonconforming use was abandoned or changed to a new or different use.

---

[2] "Q. Mr. Wilson, I believe you stated that you acquired your first truck in 1957. A. My first large truck, sir. Q. That is what I meant—tractor-trailer. You will admit prior to that, no such use was made of the premises? A. Not with a tractor-trailer, but then you can't make no more money with the small trucks. You had to change or get out completely. Q. But prior to that, there was a pigpen on it, a painting truck, and a dump truck occasionally? A. Yes, sir—all in the family." (R. 110a)

The word "discontinued" in Section 901[3] of the ordinance is to be taken as the equivalent of "abandoned", and the concept of the term "abandonment" includes the intention to abandon which is to be ascertained from overt acts, or failure to act, as well as statements. *See generally Marchese v. Norristown Borough Zoning Board of Adjustment,* 2 Pa. Commonwealth Ct. 84, 93-95, 277 A. 2d 176, 182-183 (1971).

As we also stated in *Marchese,* "Since intention is a necessary element in the concept of abandonment, it follows that lapse of time is not *per se* decisive of whether a nonconforming use has been abandoned in the absence of a specific provision in the zoning ordinance." 2 Pa. Commonwealth Ct. at 95-96, 277 A. 2d at 183. Furthermore, ". . . a temporary cessation, even for a lengthy period, *caused by circumstances over which the property owner had no control,* is generally held not to constitute proof of a discontinuance in the sense of abandonment within the meaning of zoning ordinance provisions since the circumstances themselves negate an inference of the necessary intention to abandon the use." 2 Pa. Commonwealth Ct. at 100, 277 A. 2d at 185. (Emphasis in original.) It is also noted there that the entry of the operator of the nonconforming use into the armed services has been held to excuse a cessation of use.

Disregarding, then, the period of army service between 1951 and 1955, did Richard Wilson return to the "trucking business" in such a manner as to evidence his intention to resume his 1947-1951 activities? On the contrary, after his discharge in 1955, even though he acquired a pickup truck, he chose to pursue other occu-

---

[3] "Section 901. The lawful use of land existing at the time of the adoption of this ordinance, although such use does not conform to the provisions hereof, may be continued; but, if such nonconforming use is discontinued, any future use of said land shall be in conformity with the provisions of this Ordinance."

pations, as mentioned above, and eventually bought his first tractor-trailer truck as a "hobby" before beginning anew, in 1968, the kind of "trucking business" which he had conducted from 1947-1951. Granted, he may well have used a pickup truck (which he parked on or near the lots) to earn extra money to supplement his regular job income, and, after 1957, he may also have given his brother occasional aid in the latter's business. But this was casual activity only and so infrequent that it cannot be confused with the type of commercial trucking operation that would be necessary to renew the prior nonconforming use. Clearly, Richard Wilson abandoned his commercial trucking aspirations in favor of being a sawsmith, and then only after taking two other jobs first.

Since Robert Wilson's trucking operations did not begin until late 1957, or early 1958 (at least two years after Richard was discharged from the army), it is evident that his activities did not gain the protection of a prior nonconforming use. Like Richard's 1968 undertaking, this was a new and separate enterprise, and, to this day, the two brothers operate their businesses separate and distinct from one another. "The use of the property which the ordinance protects, 'freezes', is the use which was in existence at the time of the passage of the ordinance or the change of a use district (Upper Darby Township Appeal, 391 Pa. 347, 138 A. 2d 99; Lance Appeal, 399 Pa. 311, 159 A. 2d 715) but it offers no protection to a use *different* from the use in existence when the ordinance was passed. . . . The nonconforming use which is within the orbit of protection of the law and the Constitution is the nonconforming use which exists at the time of the passage of the zoning ordinance or the change in a use district under a zoning ordinance, not a *new* or *different* nonconforming use." *Hanna v. Board of Adjustment,* 408

Pa. 306, 313-314, 183 A. 2d 539, 543-544 (1962). (Emphasis in original.)

Nor can this commercial activity continue by virtue of Section 1604(g)(7) of the ordinance.[4] Not only do we doubt that the Union Railroad, which merely connects nearby U. S. Steel plants, is an "operating railroad company" within the meaning of the ordinance, but we also fail to see how a permit issued under the section would be "reasonably necessary and essential for the public convenience or welfare" when the only benefit would inure to the Wilsons.[5]

We note also that, contrary to Section 1103 of the ordinance,[6] no "certificate of occupancy and compliance" was ever applied for by or issued to the Wilsons.

The decision of the lower court is reversed, and these cases are remanded to the Zoning Hearing Board of the Borough of West Mifflin for action not inconsistent with this opinion so as to insure that no further commercial use is made of lots 37 and 38 of the

---

[4] "Section 1604. The Board of Adjustment shall have power: (g) To issue permits, in appropriate cases on appeal for the following: (7) For the use of land and the erection and alteration of buildings abutting upon a utilized right of way of an operating railroad company in a Commercial or in a Residential District, for the uses prohibited in such districts respectively, provided the Board determines that such uses are reasonably necessary and essential for the public convenience or welfare, and not seriously detrimental to the character of the neighborhood."

[5] For this last reason also we agree with the Board that "no evidence was introduced at the [May 26, 1969] hearing to justify the grant of a variance." (R. 186a)

[6] "Section 1103. No building, structure or land shall be used or changed in use until a certificate of occupancy and compliance shall have been issued by the Building Inspector stating that the building, structure or land and the proposed use of the same complies with the provisions of this Ordinance. *A like certificate shall be issued for the purpose of maintaining, renewing, changing or extending a nonconforming use.*" (Emphasis added.)

McGowan Plan, Borough of West Mifflin, as an open-air garage for the storing and repairing of tractor-trailer trucks.

Judge MANDERINO dissents.