Willistown Township *v.* Chesterdale Farms, Inc.

454

Argued December 6, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER and ROGERS. Judge MANDERINO did not participate. Reargued October 5, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER and BLATT. Judge ROGERS disqualified himself and did not participate.

*John O. Platt, Jr.,* with him *Thomas R. Kellogg* and *MacElree, Platt & Harvey,* for appellant.

*Lawrence E. Wood,* for appellee.

OPINION PER CURIAM, February 1, 1973:
Now, February 1, 1973, after argument before the Court en banc, the Court being equally divided, the appeal is thereby rendered non-justiciable and the order of the lower court is hereby affirmed.

———

OPINION BY JUDGE MENCER IN SUPPORT OF AFFIRMANCE:
This is a zoning appeal from a decision of the Court of Common Pleas of Chester County which concerned a request for a building permit to erect and operate 480 apartment units on a 28.4 acre tract on the West Chester Pike. The court held the Willistown Township zoning ordinance, before and after its amendment to provide for apartments by special exception, unconstitutional.

The calendar of significant events in the instant case is as follows:

*May 21, 1969.* Edward Weingartner, president and principal shareholder of Chesterdale Farms, Inc. (Chesterdale), approached the Willistown Township Planning Commission with a proposal to erect apartments on a tract of ground, presently zoned RA-1 Residence District (two-acre minimum lot size required), on the south side of Pennsylvania Route 3 (West Chester Pike) in the southwest corner of the township. The subject property borders on the line dividing Willistown and Westtown Townships. Adjacent to the subject property to the west is another apartment complex located just across the township line in Westtown.

Quoting from the minutes of the May 21, 1969, meeting, "It was pointed out to Mr. Weingartner that, at present the township zoning ordinance has no provisions for apartments, and that a new ordinance would be required. It was estimated that this may take as long as one year, and that there was no guarantee that the provisions would be incorporated."

*November 19, 1969.* Weingartner, this time with two associates, John Clary and an architect, again met with the township Planning Commission. Tentative arrangements for water and sewage disposal were presented. The Chesterdale representatives were again informed that the Commission was considering incorporation of apartments in the zoning ordinance, and, "with this consideration, granting of approval for this project would in the Commission's opinion be highly irregular." After questioning the adequacy of the proposed sewage system for the project, the Commission "suggested that an informal and preliminary meeting be arranged with Chesterdale Farms, Inc. and the [township] Supervisors. The meeting was to be arranged by Chairman [of the Planning Commission] Ed Menig."

*December 3, 1969.* No meeting between Chesterdale and the Supervisors having been arranged, John Clary, representing Chesterdale, wrote William D. Sherrerd, III, Chairman of the Board of Supervisors of the township, requesting that the meeting suggested by the Planning Commission be held.

*December 16, 1969.* John O. Platt, Jr., Township Solicitor, at the request of William Sherrerd, by letter informed John Clary that "[i]n the judgment of the supervisors the proposal to amend the zoning ordinance so as to permit 'an apartment complex on the West Chester Pike bordering Westtown Township' would be inconsistent with the best interests of the township at

this time. While they appreciate your interest in the township, therefore they see no useful purpose to be served by meeting with you to discuss such a proposal."

*January 9, 1970.* Without waiting further, Weingartner by appointment met with the township Zoning Officer and presented to him an application for a building permit and certain plans for apartments. He refused to consider, examine, or accept them.

*February 13, 1970.* The Pennsylvania Supreme Court handed down its decision in *Girsh Appeal*, 437 Pa. 237, 263 A. 2d 395 (1970).

*March 4, 1970.* Chesterdale filed an action in mandamus which alleged that the Willistown Zoning Ordinance is "a systematic scheme to exclude apartments from Willistown [Township] and as such is unconstitutional," and further alleged that Chesterdale is "entitled to a building permit as a matter of right." This action in mandamus is still pending.

*May 1, 1970.* Joseph N. Ewing, Jr., a township supervisor, met with Chesterdale to discuss the apartment proposal and "the issues raised by the Mandamus Action." Ewing "suggested that the Supervisors would want the recommendations of the Planning Commission on the whole question, and that you proceed further with them." (R. 238)

*June 1, 1970.* Chesterdale again appeared before the township Planning Commission and presented revised plans for apartments. The discussion concerned a general review of sewage, water, drainage, and alternatives for solutions of problems raised.

*June 2, 1970.* John Clary wrote John O. Platt, Jr., informing him that Chesterdale had met the previous evening with the Planning Commission and had submitted a new set of plans, "a great improvement over the plans that are presently lodged with our Complaint

[in Mandamus]. It is my understanding now that the planning commission will consider our proposal and make recommendations to the supervisors. I am very much interested in hearing from you concerning the next step to be taken. In the interim we stand ready to meet at any time with the planning commission or supervisors on this matter."

*July 3, 1970.* A special meeting of the township Board of Supervisors was held to finally consider (and eventually disapprove) an application to build apartments at another location submitted by other developers. A discussion followed concerning the proposed Chesterdale apartments during which John O. Platt, Jr., "stated that he had drafted a decision disapproving the plans which had been presented to the Planning Commission" on June 1, 1970, and Joseph Ewing "stated that he was not aware of any development or subdivision application having been made by Chesterdale since its lawsuit." The minutes of the meeting indicate that the supervisors were under the impression that revised plans had been submitted to the Planning Commission on June 1, 1970, and that that body had requested further information (although the minutes of the June 1, 1970, meeting make no mention of such a request). Therefore the supervisors "concluded that there was no Chesterdale application or request requiring action or answer at this time."

*August 10 and 17, 1970.* Advertisements were made announcing a public hearing to be conducted by the township supervisors on August 25, 1970, the purpose of the meeting being to consider a proposed amendment to the township zoning ordinance (which was originally adopted in 1961) and zoning map, and particularly the creation of a new OA (Office-Apartment) classification and the rezoning of a section of land along U.S.

Route 30 (Lancaster Pike) as an OA district to allow for apartment use by special exception.

*August 21, 1970.* Chesterdale again submitted an application for a building permit to the Zoning Officer who immediately disapproved it explaining that a new zoning ordinance amendment concerning apartments was then pending. An appeal was taken the same day by Chesterdale to the Willistown Township Zoning Hearing Board.

*August 25, 1970.* The amendment to the zoning ordinance and map as advertised was adopted by the Board of Supervisors after a public hearing.

Four hearings were held before the Zoning Hearing Board in this matter on September 16, October 12, October 27, and November 17, 1970, but, by agreement of the parties, the record was not closed until January 25, 1971. Since the Board had no power to pass on the validity of the township zoning ordinance because of Section 910 of the Pennsylvania Municipalities Planning Code (Planning Code), Act of July 31, 1968, P. L.    , No. 247, 53 P.S. §10910, it properly only decided ". . . all contested questions of interpretation and [made] findings on all relevant issues of fact . . ." despite the fact that Chesterdale had, in its mandamus action, alleged the unconstitutionality of the ordinance then existing, and again raised the issue of the validity of the ordinance as amended August 25, 1970, in its appeal to the Board. In dealing with the appeal, however, the Board (by its opinion dated March 5, 1971) stated, "While the application is unclear as to whether it is an application for a variance, this Board deems that it is, and therefore will resolve the issue as to whether Applicant is entitled to a variance under the evidence presented." The Board then proceeded, using Section 912 of the Planning Code, 53 P.S. §10912, as a guide, to deny the application for a "variance."

Chesterdale then appealed to the Court of Common Pleas of Chester County alleging, *inter alia,* that the township zoning ordinance "is, was, and has been since prior to 1969, unconstitutional as it pertains to construction of apartments." The court, after agreeing with the Board that a variance was not the proper remedy, noted that the ordinance prior to August 25, 1970, had no provision for apartments, found the prior ordinance to be in violation of *Girsh Appeal, supra,* and then, after an examination of the new Article X of the amended ordinance, concluded that it "is a scheme of zoning that has an exclusionary purpose so far as it affects construction of apartments, and is, therefore, unconstitutional." The township then appealed to this court.

Where, as in this case, the court below took no additional testimony, our function is to determine whether the Board clearly abused its discretion or committed an error of law. *Lower Providence Township and Wood v. Ford,* 3 Pa. Commonwealth Ct. 380, 283 A. 2d 731 (1971), and cases cited therein.

We agree with the lower court that the township zoning ordinance, before and after its amendment, is unconstitutional because, for the reasons which follow, it effectively permits the township to accept only those elements and only that proportion of the population of which it approves.

By discussing the January 9 and August 21, 1970, building permit applications, the Board in its opinion dealt at length with the question of whether the prior ordinance or the ordinance as amended August 25, 1970, governed the appeal to them. It is apparent from the foregoing chronology that since the January 9, 1970, application was never accepted, there could be no disapproval thereof from which an appeal could have been taken to the Board. In addition, the action in man-

damus to compel acceptance of that application is still pending. From our examination of the record, the disapproval of the August 21, 1970, application was the first appealable order herein and thus initiated this appeal.

Since the township had advertised on August 10 and 17, 1970, that a public hearing would be held concerning an amendment providing for apartments by special exception, and since Chesterdale filed its application thereafter, the so-called "pending legislation doctrine" demands that the amended ordinance of August 25, 1970, apply to this appeal. *Mutzig v. Hatboro Board of Adjustment*, 440 Pa. 455, 269 A. 2d 694 (1970); *Boron Oil Company v. L. C. Kimple*, 1 Pa. Commonwealth Ct. 55, 275 A. 2d 406 (1970), *aff'd*, 445 Pa. 327, 284 A. 2d 744 (1971); *Cameron v. Greensburg*, 3 Pa. Commonwealth Ct. 209, 281 A. 2d 271 (1971). This is not a case where Chesterdale was still required to obtain further approval from the Board in order to gain a vested right to a building permit—the applicant challenged the validity of the ordinance directly without first seeking a variance, which was a proper approach.[1]

---

[1] "The cases have not always managed to distinguish clearly between a challenge to the administrative decision on a variance request and a true constitutional challenge. This confusion is in large measure due to the fact that a variance, although an administrative remedy, is in itself a form of constitutional challenge. The difference is that a variance request challenges the ordinance because, as applied to a specific piece of property, the ordinance operates to create an undue hardship which is peculiar to that property. By contrast, a true constitutional challenge is a challenge to the scope of the statutory authority regardless of the existence of a particular hardship, and may challenge the operation of the ordinance as applied to a specific piece of property as well as the application of the ordinance to all of the land within its purview." Comment, *The Pennsylvania Supreme Court and Exclusionary Suburban Zoning: From Bilbar to Girsh—A Decade of Change*, 16 Vill. L. Rev. 507, 511 (1971).

*National Land and Investment Company v. Easttown Township Board of Adjustment*, 419 Pa. 504, 215 A. 2d 597 (1965). Therefore, if successful in its challenge, it would be entitled to a building permit as a matter of right.

I.

Exclusionary suburban zoning in the United States has been discussed in many court decisions[2] and has been the subject of much literature[3] and controversy

---

[2] *See, e.g., Dailey v. City of Lawton*, 296 F. Supp. 266 (W.D. Okla. 1969), *aff'd*, 425 F. 2d 1037 (10th Cir. 1970) ; *Southern Alameda Spanish Speaking Organization v. Union City*, 424 F. 2d 291 (9th Cir. 1970) ; *Crow v. Brown*, 332 F. Supp. 382 (N.D. Ga. 1971) ; *Kennedy Park Homes Ass'n v. City of Lackawanna*, 318 F. Supp. 669 (W.D. N.Y. 1970), *aff'd*, 436 F. 2d 108 (2nd Cir. 1970), *cert. denied*, 401 U.S. 1010 (1971) ; *Oakwood at Madison, Inc. v. Township of Madison*, 117 N.J. Super. 11, 283 A. 2d 353 (1971).

[3] *See, e.g.*, Babcock & Bosselman, *Suburban Zoning and the Apartment Boom*, 111 U. Pa. L. Rev. 1040 (1963) ; Cutler, *Legality of Zoning to Exclude the Poor: A Preliminary Analysis of Evolving Law*, 37 Brooklyn L. Rev. 483 (1971) ; Feiler, *Metropolitanization and Land-Use Parochialism—Toward a Judicial Attitude*, 69 Mich. L. Rev. 655 (1971) ; Michelman, *The Advent of a Right to Housing: A Current Appraisal*, 5 Harv. Civ. Rights-Civ. Lib. L. Rev. 207 (1970) ; Strong, *Girsh and Kit-Mar: An Unlikely Route to Equal Opportunity in Housing*, 22 Zoning Digest 100a (1970) ; Walsh, *Are Local Zoning Bodies Required by the Constitution to Consider Regional Needs?*, 3 Conn. L. Rev. 244 (1971) ; Williams, *The Three Systems of Land Use Control*, 25 Rutgers L. Rev. 80 (1970) ; Note, *Suburban Apartment Zoning: Legality and Technique*, 12 B.C. Ind. & Com. L. Rev. 955 (1971) ; Note, *Snob Zoning: Developments in Massachusetts and New Jersey*, 7 Harv. J. Legis. 246 (1970) ; Note, *Exclusionary Zoning and Equal Protection*, 84 Harv. L. Rev. 1645 (1971) ; Note, *The Use of Zoning Laws to Prevent Poor People from Moving Into Suburbia*, 16 How. L.J. 351 (1971) ; Note, *Suburban Zoning Ordinances and Building Codes: Their Effect on Low and Moderate Income Housing*, 45 Notre Dame Lawyer 123 (1969) ; Note, *In Re Appeal of Girsh: A Pig in the Parlor Instead of the Barnyard?*, 32 U. Pitt. L. Rev. 83 (1970) ; Note, *The*

among scholars. The result of such parochial[4] legislation has recently been succinctly described as follows:

"Our cities are presently engaged in a struggle to survive. The vast influx of nonwhites into industrial urban areas, combined with the migration of white middle class families to suburban communities, has left the urban areas with swollen populations and a deflated tax base. In recent years there has been a mounting demand for decent housing from the entire spectrum of urban income groups. However, many of the suburban communities have succeeded, *often inadvertently*, in preventing low income residents of the metropolitan community from seeking more desirable suburban living through techniques such as large-lot zoning, minimum floor size requirements, and the exclusion of apartments. Thus, low income groups have been confined to the inner city, higher income groups have been attracted

*New Jersey Judiciary's Response to Exclusionary Zoning*, 25 Rutgers L. Rev. 172 (1970) ; Note, *Appeal of Girsh: A Judicial Requirement for Apartment Zoning*, 24 Sw. L.J. 838 (1970) ; Note, *The Responsibility of Local Zoning Authorities to Nonresident Indigents*, 23 Stan. L. Rev. 774 (1971) ; Note, *Extending Standing to Nonresidents—A Response to the Exclusionary Effects of Zoning Fragmentation*, 24 Vand. L. Rev. 341 (1971) ; Comment, *Discriminatory Zoning: Legal Battleground of the Seventies*, 21 Am. U.L. Rev. 157 (1971) ; Comment, *Judicial Attitudes Toward Multiple-Family Dwellings: A Reappraisal*, 28 Wash. & Lee L. Rev. 220 (1971).

[4] "While controversy has often raged about judicial action in other areas, it has always been recognized that it is an essential part of the judicial function to watch over the parochial and exclusionist attitudes and policies of local governments, and to see to it that these do not run counter to national policy and the general welfare. Constitutional law should serve to shed light upon thinking about local planning, by requiring those concerned to do what they should be doing anyway—to work out the relationship between planning the future environment and the great issues connected with human freedom and opportunity." Williams, *Planning Law and Democratic Living*, 20 Law & Contemp. Prob. 317, 319 (1955).

to the suburban community, and the result has been economic segregation.

"The great suburban migration coupled with the crowded condition of the cities has caused the introduction of industry into the outlying areas. But even that does not break the pattern of economic segregation, as most of the unskilled and semi-skilled workers must commute long distances from the cities because of the absence of available low cost housing near their jobs. All of this exacerbates economic cleavages in the metropolitan area and has a correspondingly depressant effect on population mobility within that area. Thus, we have an urban core, surrounded by economically homogenous suburbs which, through zoning, pose an effective barrier to socio-economic dispersion throughout the entire region." Comment, *Zoning: Closing The Economic Gap*, 43 Temp. L. Q. 347, 348 (1970) (Emphasis added.) [5]

Typically, the basic conflict is "between suburban residents who are seeking continued stability in the form of assurances that any further development of their community will be a continuation of existing low density uses, primarily consisting of single family resi-

---

[5] We emphasize the words "often inadvertently" because *the result* of Willistown Township's ordinance may well have been inadvertent, the township fathers having had no intention of creating such a result (the ordinance was drafted for the township by an institution which specializes in drafting municipal legislation). Although we draw upon the wealth of information written in this area, we cannot agree generally with those articles which paint a picture of the suburbanite as callously self-seeking, snobbishly building barriers against the rights of others, incredibly insensitive to his obligations. The language in which these few articles are written, usually accusatory, often self-righteous, will not contribute to cooperation. We do not believe that suburbanites are really that cruel, that cooly indifferent to the misery of fellow human beings, and we do not by this opinion mean to contribute to that misconception.

dences on large lots, and the non-residents, along with their representatives, the builders [or developers], who are seeking change in the form of suburban construction of commercial facilities, apartment houses and other high density, high profit, land uses."[6]

Despite its recent notoriety, the exclusionary use of zoning was first noted in the lower court's opinion in *Village of Euclid v. Ambler Realty Co.,*[7] discussed by Norman Williams, Jr., during the fifties,[8] and brought to national attention in 1968 by the Douglas Commission Report, *Building the American City.*[9] Freilich and Bass, *Exclusionary Zoning: Suggested Litigation Approaches,* 3 Urban Law. 344, 346 (1971); *see also* Note, *The Constitutionality of Local Zoning,* 79 Yale L. J. 896, 911 (1970).

Chief Justice BELL, in his dissenting opinion in *Bilbar Construction Co. v. Easttown Township Board of Adjustment,* 393 Pa. 62, 141 A. 2d 851 (1958), anticipated the development of exclusionary zoning and its obvious effects: "Moreover, such an unconstitutional concept and application of the police power would likewise apply to *every* suburban area, district, township, and county and would stifle and in reality effectually block the expansion of our country's rapidly growing population into any suburban township or county, or

---

[6] *A Decade of Change, supra* note 1, at 508.

[7] "The plain truth is that the true object of the ordinance in question is to place all property in a strait-jacket. The purpose to be accomplished is really to regulate the mode of living of persons who may hereafter inhabit it. In the last analysis, the result to be accomplished is to classify the population and segregate them according to their income or situation in life." 297 F. 307, 318 (N.D. Ohio 1924), *rev'd,* 272 U.S. 365 (1926).

[8] Williams, *supra* note 4.

[9] *Building the American City, Report of the National Commission on Urban Problems,* H.R. Doc. No. 91-34, 91st Cong., 1st Sess. esp. 215-17 (1968).

would herd the poor and medium income people into specified areas and effectually and intentionally limit parts or all of a county to the rich or well-to-do. Such an intentional and exclusionary interdiction is contrary to our constitutional guarantees and to the American Way of Life. It is clear that the aforesaid theories and contentions of the zoning authorities, even if supported by testimony—which they were not—(1) are for the benefit of only the rich or well-to-do and are not for the general welfare, and (2) have no substantial relation to and are not reasonably and clearly necessary for the health, safety or morals of the residential district involved." 393 Pa. at 90, 141 A. 2d at 865 (dissenting opinion) (Emphasis in original.)

Of necessity, a re-examination of our basic zoning structure has begun in Pennsylvania with two recent decisions by our Supreme Court—*Girsh Appeal, supra,* and *Concord Township Appeal* (perhaps better known as *Appeal of Kit-Mar Builders, Inc.*), 439 Pa. 466, 268 A. 2d 765 (1970). These, of course, were preceded by the landmark decision in *National Land and Investment Company, supra.* These decisions, however, are mere harbingers of what "looms as the major domestic, social and political battle of the decade ahead—a battle whose outcome will be of enormous importance in determining the structure of U.S. society for many years to come.[10] *See Newsweek Magazine,* November 15, 1971,

_____

[10] Three major problems are caused by exclusionary zoning practices. First, there is a shortage in the housing supply. Indigents are excluded from nearby jobs or are forced to occupy available housing under conditions of overcrowding. Second, the available housing is undesirable, located at a distance from shopping areas and recreational and occupational facilities. Furthermore, such housing is frequently substandard in age, condition, and proximity to unattractive uses. Third, exclusionary zoning prevents integration along socio-economic lines, resulting in poorer schools and inadequate municipal services. Marcus, *Exclusionary Zoning: The*

at 61; *see also* Davidoff & Gold, *The Suburbs Have to Open Their Gates, New York Times Magazine,* November 7, 1971, at 40; Dietsch, *Cracking the Suburbs, The New Republic,* September 5, 1970, at 8.

## II.

In this appeal we are brought face to face with the most compelling problem posed by the *Girsh* case: If total prohibition of apartments within a municipality is not to be countenanced, at what point short of total prohibition will a township be found to have met its responsibilities to the community at large under the Constitution?

Zoning has been said to be exclusionary when the zoning laws of a community seriously impede or absolutely prevent the construction of low-cost housing.[11] By any definition, however, the term "exclusionary zoning" has come to signify the general problem created by local zoning ordinances that render suburban housing costs so prohibitively high that low- and moderate-income families cannot afford to buy. Exclusionary zoning may bar not only the poor or near poor, but a fairly substantial segment of the middle class as well.[12] Chesterdale recognizes this by positing as the "crux" of its entire argument that a township must make provision to accept its "fair share" of all types of housing and income groups from within the metropolitan area.

---

*Need For A Regional Planning Context,* 16 N.Y.L.F. 732, 733 n.13 (1970); *see* Sager, *Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent,* 21 Stan. L. Rev. 767, 781-82 (1969); Shields & Spector, *Opening Up the Suburbs: Notes on a Movement for Social Change,* 2 Yale Rev. Law & Social Action 300 (1972).

[11] Note, *The Equal Protection Clause and Exclusionary Zoning After Valtierra and Dandridge,* 81 Yale L.J. 61, 62 (1971).

[12] Sager, *supra* note 5, at 792.

This "fair-share" approach has support in *National Land, Girsh,* and in *Concord Township.* The Supreme Court in *Girsh* stated: "Municipal services must be provided *somewhere,* and if Nether Providence is a logical place for development to take place, it should not be heard to say that it will not bear its rightful part of the burden. . . . The simple fact that someone is anxious to build apartments is strong indication that the location of this township is such that people are desirous of moving in, and we do not believe Nether Providence can close its doors to those people." 437 Pa. at 244-5, 263 A. 2d at 398-9 (Emphasis in original.) Similarly, the Court in *Concord Township* (quoting from *Village 2 at New Hope, Inc. Appeals,* 429 Pa. 626, 241 A. 2d 81 (1968)) spoke of "the reluctance of the rural communities to absorb their fair share of the load. . . ." 439 Pa. at 475, 268 A. 2d at 769. As the Superior Court of New Jersey said in *Oakwood at Madison, Inc. v. Township of Madison, supra* note 2, at 20, 283 A. 2d at 358: "In pursuing the valid zoning purpose of a balanced community, a municipality must not ignore housing needs, that is, its fair proportion of the obligation to meet the housing needs of its own population and of the region. Housing needs are encompassed within the general welfare. The general welfare does not stop at each municipal boundary."

"Fair share" is much like the word "reasonable"— difficult of definition but still capable of indicating what is expected within bounds which only individual cases can define. We merely contend here that Willistown Township does not meet this "fair-share" test. *See* Craig, *The Dayton Area's "Fair Share" Housing Plan Enters the Implementation Phase, City,* January/February, 1972, at 50. This admittedly is a piecemeal approach, but such is inherently a part of the judicial process. Changes in the law, in the absence of legisla-

tion, by necessity have traditionally occurred on a case-by-case basis.

The most cursory of glances at the amendment of August 25, 1970, reveals that Willistown Township is hardly accepting "its rightful part of the burden." We note the following from the record (Edward Weingartner answering):

"We investigated the area and we saw in that area on the West Chester Pike approximately—in other Townships, of course—maybe nine hundred to a thousand units already constructed, which were well received by the public, fully rented, with waiting lists.

"Then, of course, we went to the Chester County Planning Commission, and we got a Chester County Planning Commission Book, which showed us building permit approvals over the past eight years up 'til 1968. The book was written until 1968.

"We noticed that in 1960 thirteen per cent of all dwelling units constructed in Chester County were apartments, whereas in 1968 fifty-six per cent of all dwelling units constructed were apartments, which increased the percentage by quite a bit. So we felt that there was a definite demand in the area for apartments." (R. 4-5).

"Q. Orienting ourselves, tell us what is in the vicinity of this piece of property, starting to the east? A. Well, to the east there is a farm, I suppose, Jacob's farm. To the west of us there is, our boundary is the same boundary line as the Hunter Run Apartment, which is I think approximately 80-unit apartment building. Q. All right, to the south, back here? A. Basically in the immediate vicinity that's Westtown Township but in Willistown it is more or less open ground. I believe there may be a tennis club up there or something. Q. And across West Chester Pike to the north? A. Well, there's a Sunoco station there. I

would not know whether it is in the Township or not. And basically open ground. Q. Going westwardly on both sides of West Chester Pike, perhaps five hundred yards, are there any other commercial or high density uses? A. Yes. Well, there's another gas station within about I guess a half mile. No, not even a quarter of a mile. Then there's a tract of ground zoned on both sides of the Pike for shopping center, I believe it is a total of about forty acres, roughly, on both sides of the pike, in Westtown, and, of course, 352 is, the northeast corner there's a commercial zoning. There's a school on the southwest corner. Then of course you have John Baton's property, which is 110 apartments. There's another piece zoned right next to that, across the street from that, 426 apartments, and about another quarter of a mile down the road on the West Chester Pike there's another large apartment development, Water Gate, I think it is. Q. Water View? A. Water View, and of course from there on into West Chester they are basically all commercial, along the West Chester Pike. The same way the other way from Willistown. Q. Going east 500 yards, say from the entrance to your property, are there any other commercial uses that you haven't mentioned, or high density residential? A. East? Q. East towards Philadelphia. A. Not that I know of." (R. 51-3).

Chesterdale certainly wishes to build in this township, and other apartment uses have already come to fruition in the surrounding area. The following from *Initial Housing Report—Status of Housing*, 7, 24 (1971), prepared by the Chester County Planning Commission, is noteworthy:

"In the ten-year period from 1960 to 1970, the Census count of housing units in Chester County rose by 36.4 percent, an increase of over 21,400 housing units, and a record for new construction in Chester County.

Nevertheless there is ample evidence that the current supply of housing falls short of meeting the needs of many households who work or reside in the County. *Looking ahead to the 1970's, a serious shortage of housing in Chester County will continue if present trends are not reversed.*

"An increasing number of households dropped out of the market for new housing in Chester County during the late 1960's as the cost of housing outpaced income increases. Today, middle and lower-middle income families are hard pressed to find new or used housing in Chester County at a price they can afford. Moderate and low income families 'make do' with substitutes for adequate housing. A long journey to work, doubling up with another family, or use of substantial housing units are among the alternatives for standard housing in Chester County.

. . . .

"During the last half of the 1960 decade, new housing units authorized by building permits were almost evenly split between single-family and multiple-family structures. For each 100 housing units authorized, 51 were scheduled for construction in an apartment structure. . . . Population and construction trends for the 1970's indicate a continuing demand for new apartment housing in Chester County." (Emphasis added.)

So "the location of this township is such that people are desirous of moving in," and "[t]he question posed is whether the township can stand in the way of the natural forces which send our growing population into hitherto undeveloped areas in search of a comfortable place to live." *National Land and Investment Company, supra,* 419 Pa. at 532, 215 A. 2d at 612. This influx is acknowledged by the township when it points to the township population increase "from 2,709 persons in the 1950 census to 9,128 in that of 1970, an in-

crease of 337% in twenty years." But the zoning ordinance thwarts such movement because (1) the requirements for construction of apartments are such that only high-cost, low density units can feasibly be constructed, and (2) the ground area zoned for apartment use is effectively so small in relation to the total size of the township as to be a mere token in response to the mandate of *Girsh*.

We grant that here, as in *Girsh*, "luxury" (or near-luxury) apartments are to be built on the subject property.[13] We also realize "that while the exclusionary effect on low income and minority groups is [often] urged as a basis for [a] regulation's invalidity, in fact, the plaintiff in the action is more often than not a commercial developer out to maximize his return from the land."[14] Whether or not that is the case here is beside the point. Our concern here is with the validity of the entire ordinance, as it applies to *all* land within the township, and as it affects thousands of people besides the immediate parties to this suit. Taken in its entirety, regardless of this single proposed use, there can be little doubt that this ordinance prohibits the construction of lower-cost apartments. "The policy issue thus becomes one of the quantum of acknowledged social injustice involved in a formal governmental unit excluding or segregating people on the basis of their means."[15]

---

[13] The minutes of the June 1, 1970, Planning Commission meeting indicate that apartment rentals were planned as follows: efficiencies $185; one bedroom $200; two bedrooms $265; and three bedrooms $300. Chesterdale's architect also stated, "For the purposes of mortgage, this would be described as a middle to high income dwelling." (R. 88-9).

[14] Marcus, *supra* note 5, at 732.

[15] Sager, *supra* note 5, at 791, *quoted in Concord Township Appeal*, 439 Pa. at 470 n.2, 268 A. 2d at 766 n.2.

## III.

Section 1009 of the amended ordinance was quoted at length by and evidently was most offensive to the lower court. It epitomizes "[t]he expected reaction of suburban communities [to Girsh] . . . to walk the tightrope of reasonable regulation, that is, to pass zoning and other land use restrictions which make it extremely unattractive to construct apartments, but which are still [or try to be] within constitutional limits."[16]

For example, Section 1009(2) permits density of 10 dwellings units or 30 habitable rooms *per acre* for apartments;[17] with elevators, density may be 13 dwelling units or 39 habitable rooms per acre.[18] The township argues that it "is reasonable to posit 3 persons per dwelling unit. *Assuming buildings with elevators,* the 80 acres zoned for apartments can accommodate 3,120 new residents of Willistown Township. The 1970 census shows the township population at 9,128 persons in 2,570 dwelling units. . . . Full development of the apartment zone, by itself, would increase the township population by about 1/3 of its present level. Taking another measure of comparison, the acreage if fully developed by apartments *with elevators* would add 1,040 dwelling

---

[16] Washburn, *Apartments in the Suburbs: In re Appeal of Joseph Girsh,* 74 Dick. L. Rev. 634, 661 (1970). .

[17] Section 201(12) defines "dwelling unit" as "That portion of a multiple dwelling designed for occupancy by an individual or single family." Section 201(16) defines "habitable room" as "A room as bounded by fixed partitions and doorways other than kitchens, dinette-kitchens, utility rooms, bathrooms, offices, shops, common rooms, and circulation and closet space."

[18] Section 1009(2) states: *"Density.* There shall be sufficient lot area to provide a density of not more than ten (10) dwelling units or thirty (30) habitable rooms per acre, whichever constraint may be the more binding, except that either constraint may be increased to thirteen (13) dwelling units or thirty-nine (39) habitable rooms in buildings served by elevators."

units to the 2,570 existing. To describe as exclusionary a zoning change permitting a 40% increase in the municipality's dwelling units is to invest that term with an Alice in Wonderland quality." (Emphasis added.)

But, "Everything's got a moral, if only you can find it."[19] The moral here is that when more realistic arithmetic is used the outcome is less pristine. To begin with, when the building height restriction is generally made comparable to "the height of mature trees"[20] instead of to the acute need for low and moderate income housing, then fantasy truly does reign. Moreover, we think it more realistic to calculate the potential increase in population and dwelling units by using "non-elevator" figures. Thus, positing the same 3 persons per dwelling unit, but assuming buildings, without elevators, the 80 acres zoned for apartments can accommodate only 2,400 new residents. The increase in population, instead of being 1/3, would be closer to 1/4. The increase in dwelling units, instead of being 40%, would be closer to 30%.

But even these figures are misleading because 40 of the rezoned 80 acres are owned by an educational institution (Villa Maria Academy), and we cannot assume that these 40 acres will be "on the market" for apartment land development. The above figures then are cut in half and become 1/8 and 15% respectively. The record reveals that the remaining 40 acres of rezoned land is under active consideration for apartment development—40 acres out of a total township area of

---

[19] L. Carroll (Charles Dodgson), *Alice in Wonderland*, Chapter 9 (1865).

[20] "Section 1014. *Scenic Preservation*. . . . The height restriction to thirty-five (35) feet [or three stories, including any basement] is imposed to assure that buildings will not generally exceed the height of mature trees."

18.53 square miles (11,859 acres),[21] or .0033 of the township area. The tokenism therefore becomes most apparent.

Even though the township contends that the 80-acre rezoning is "but the initial stage in high density zoning plans for the township," its efforts, *standing alone,* are not sufficient. There is simply no "fair-share" provision made, either in terms of land area or less restrictive ordinance requirements, for low or moderate cost apartments. Consequently, the strictly local interests of the township must yield since they are plainly in conflict with the general interest of the public at large, and "the municipality would not [cannot] be allowed to stand in the way." *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 390 (1926).

We further note that, according to Section 1416(1) of the ordinance, concerning conservation, "Where feasible, slopes steeper than fifteen (15) percent shall be left in their natural state." Yet, from the topographical map appended to the record, it would seem that much, if not all, of the 80 acres rezoned is steeply sloped.

## IV.

The township argues that Chesterdale's "fly-by-night operations" constitute "haphazard growth" in that the proposed apartment site, being located in the southwestern most corner of the township, is too remote from existing police, fire, school, public water, and sewage facilities. Of course, the major factor underlying most of these reasons is the fiscal one, *i.e.,* the need to limit municipal objectives since property tax revenues will support only a limited community ser-

---

[21] 1972 *Bulletin Almanac* 62.

vice infrastructure.[22] "Once the power to regulate apartment use to protect fiscal integrity is established, there is presented the constitutional requirement that the exercise must not be arbitrary or unreasonable."[23] The township cannot "prevent the entrance of newcomers in order to avoid future burdens, economic and otherwise, upon the administration of public services and facilities," but certainly "a governmental body may . . . utilize its zoning power in order to insure that the municipal services which the community requires are provided in an orderly and rational manner." *National Land and Investment Company, supra,* 419 Pa. at 532, 215 A. 2d at 612. Unfortunately, the latter utilization often effectively results in the former prevention.

Here, for example, the map accompanying the Pennsylvania Act 537 Sewer Plan for Chester County (officially adopted by all 73 municipalities of the county) shows in general terms the area presently sewered, the area to be sewered within ten years (1968-1978), and consultants' recommendations for area that will need sewers within twenty years (1978-1988). The map indicates that only the northern 1/4 of Willistown Township is to be sewered between 1968 and 1978, and no provision has been made for the rest of the township to be sewered between 1978 and 1988. The record re-

---

[22] M. Brooks, *Exclusionary Zoning* 3, 6 (American Society of Planning Officials 1970). "[L]egitimate use of the zoning power . . . does not encompass the right to erect barricades . . . where the real purpose is to prevent feared disruption with a so-called way of life. Nor does it encompass provisions designed to let in as new residents only certain kinds of people, or those who can afford to live in favored kinds of housing, or keep down tax bills of present property owners." *Vickers v. Township Committee of Gloucester Township,* 37 N.J. 232, 264-5, 181 A. 2d 129, 147 (1962) (dissenting opinion).

[23] *Symposium: Apartments in Suburbia: Local Responsibility and Judicial Restraint,* 59 Nw. U.L. Rev. 344, 417 (1964).

veals, however, that, because of underground composition, on-site sewage facilities in the southern part of the township often function improperly.

For Chesterdale, at least, its property being contiguous with Westtown Township, the picture is brighter. Almost all of the eastern portion of that township is scheduled to be sewered between 1968 and 1978 and thus, at least theoretically, could serve much of the western portion of Willistown Township, including the tract owned by Chesterdale.[24] Chesterdale, in fact, has made appropriate arrangements with Westtown Sewer Company, although that company must first expand its facilities to accommodate Chesterdale and at least one other apartment complex in Westtown Township. This arrangement has been criticized by the appellant township because it doubts Westtown Sewer Company can make such an accommodation, and further because that company's sewage plant is to be replaced at some time in the future by a larger regional plant located in West Goshen Township, Chester County. We think, however, that it would be unreasonable to deny Chesterdale's application on these grounds when it can feasibly make arrangements with a nearby plant until sewers eventually reach the southern part of Willistown Township.

Chesterdale has also made appropriate arrangements for water with the Philadelphia Suburban Water Company and the Great Valley Water Company. The for-

---

[24] "The effective development of a region should not and cannot be made to depend upon the adventitious location of municipal boundaries, often prescribed decades or even centuries ago, and based in many instances on considerations of geography, of commerce, or of politics that are no longer significant with respect to zoning. The direction of growth of residential areas on the one hand and of industrial concentration on the other refuses to be governed by such artificial lines." *Duffcon Concrete Products v. Borough of Cresskill*, 1 N. J. 509, 513, 64 A. 2d 347, 350 (1949).

mer company holds a franchise for the area including Chesterdale's tract, but it has not yet extended its water system to the area. Rather than impede progress, however, it has agreed to permit Great Valley to serve Chesterdale in its stead. We see no reason why such give-and-take cannot be utilized as to sewerage needs.

Rather than belabor this point further, and since Willistown Township "is located so that it is a place where apartment living is in demand," we point out that "[w]hether a potential sewerage problem exists or not is irrelevant"[25] since the Supreme Court explicitly rejected such arguments in *National Land, Girsh,* and *Concord Township, supra.* As the Court stated in *Concord Township,* "We in effect held in National Land that because there were alternative methods for dealing with nearly all the problems that attend a growth in population, including sewage problems, zoning which had an exclusive purpose or effect could not be allowed." 439 Pa. at 473, 268 A. 2d at 768. *See G & D Holland Construction Co. v. City of Marysville,* 12 Cal. App. 3d 989, 91 Cal. Rptr. 227 (1970).

## V.

Having found that the amendment to the 1961 township zoning ordinance does not pass constitutional muster because, standing alone, it neither provides for sufficient land area nor for lower cost apartment buildings, we must agree with the lower court that the prior ordinance violated *Girsh* as well since it made *no* provision for apartments whatsoever. The township attempts to avoid this conclusion by distinguishing itself from the facts in *Girsh* which case "concerned itself with a suburban township of 4.64 square miles with a population of almost 13,000 persons. The case at bar

---

[25] *Concord Township Appeal,* 439 Pa. at 472, 268 A. 2d at 767.

involves an exurban township of about 18.53 square miles with a population of less than 10,000." This begs the question, however, because Willistown Township is a logical area for development and population growth within the contemplation of *Girsh*, and this township therefore must abide by *Girsh's* mandate.

The guidelines necessarily implied by *Girsh*, even if not specifically stated there, are applicable here and are about as clear as our imprecise language can make them. Municipalities should be required to follow them in good faith. Municipal officials must not only refrain from enacting a zoning ordinance which would bar apartment construction altogether, but they must also refrain from enacting any such ordinance so as to allow apartment construction but necessarily limit it to relatively high-cost construction only.

## VI.

It is well settled that property owners are entitled to use and improve their land free of governmental interference, except to the extent that the government regulates such use or improvement in the common interest. *Nebbia v. New York*, 291 U.S. 502, 523 (1934). Is Chesterdale then free to build its apartment complex unfettered by any regulations since the lower court held the township's regulations unreasonable? Merely to ask the question is to answer it—the Supreme Court in *Girsh* "reserved for municipalities the right to regulate or restrict uses, so long as such regulation or restrictions are *reasonable*. If a municipality uses this right in an unreasonable manner to restrict a use to a very small or a topographically unusable site, such regulation should be unconstitutional as a total prohibition because adopted with the intent or result of excluding population [which scheme of zoning "is not ac-

ceptable in Pennsylvania," *Concord Township Appeal, supra,* 439 Pa. at 470, 268 A. 2d at 766]."[26] (Emphasis added.) But we would be ill-advised to simply send "the matter back to the local government for resolution. In the process of remedying the constitutional flaw, the local decision-making machinery will again respond to the political pressures which caused the original ordinance to exclude apartments. This in fact was the aftermath of Girsh. Shortly after the decision Nether Providence began consideration of an amendment to the zoning code which permitted apartment development on four tracts in the Township, but left the [Girsh] Duer Tract zoned R-1 Residential."[27]

There is a further quandary for the courts: "To strike down an ordinance such as that in the instant case will work a hardship upon suburban townships whose residents have made a good faith if not altogether successful effort to channel population growth in a fashion commensurate with the welfare of its citizens past, present, and future. Conversely the invalidation . . . will provide a modicum of short-term relief . . ." because "[a]t some point, if the flight to the suburbs continues, whatever new zoning strictures the township erects will again begin to constitute a barrier. The court will then have to decide whether they

---

[26] Washburn, *supra* note 16, at 650.

[27] *Id.* at 653. But, as Washburn notes, "This attempt to impede apartment development on the Duer Tract will probably fail. The Pennsylvania Supreme Court's reversal of the court of common pleas has the effect of reversing the decisions of the Nether Providence Zoning Board and the building inspector refusing to grant permits to construct apartment buildings. The new developer (Girsh's transferee) should, therefore, be entitled to the requested permits." 74 Dick. L. Rev. at 653-4 n.77. *The Pennsylvania Supreme Court in fact ordered, on August 29, 1972, that the requested permits be issued to Girsh's transferee.*

in their turn are reasonable."[28]   However, "[t]he time must never come when, because of frustration with concepts foreign to their legal training, courts abdicate their judicial responsibility to protect the constitutional rights of individual citizens." *National Land and Investment Company, supra,* 419 Pa. at 522, 215 A. 2d at 607.   "We fully realize that the overall solution to these problems lies with greater regional planning; but until the time comes that we have such a system we must confront the situation as it is." *Concord Township Appeal, supra,* 439 Pa. at 476, 268 A. 2d at 769.

We believe that Chesterdale, just as Girsh's transferee, should be granted the necessary building permit to complete its apartment complex as planned. As *Girsh* indicates, the township "can protect its attractive character by requiring [these] apartments to be built in accordance with (reasonable) set-back, open space, height, and other light-and-air requirements. . . ." 437 Pa. at 245, 263 A. 2d at 399.   Above all, the township in its actions must be reasonably regulatory, instead of

---

[28] Comment, *Constitutional Law—Due Process—Zoning—Suburban Township Zoning Ordinance Which Does Not Provide for Apartments as Permissible Residential Use Violates Due Process,* 23 Ala. L. Rev. 157, 165 & n.35 (1970). This Comment continues at pp. 167-8: "Because of the many technical questions and conflicts of interests involved, the judicial system with its inherent limitations appears to lack the ability needed to arrive at a truly comprehensive answer to the problem of overcrowding. Still, courts have been forced to consider land use plans because the somewhat vague legislative efforts in this direction have in the past been monumentally unsuccessful. The passage of effective, enlightened legislation seems to be the only satisfactory way to alleviate overcrowding and yet preserve the integrity of small communities. The immensity of the problem and the degree of objectivity needed to fairly weigh all competing interests demand that the necessary action be taken by state legislatures, rather than regional or county governmental units. That attempted regional and county approaches to the problem for the most part have only succeeded in clouding the issues also manifests the need for statewide action."

exclusionary, because "[t]he Constitution . . . was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. Seelig,* 294 U.S. 511, 523 (1934).

Judges CRUMLISH, JR. and KRAMER join in this Opinion.

----

OPINION BY JUDGE WILKINSON, IN SUPPORT OF AFFIRMANCE IN PART AND REVERSAL IN PART:

Prior to February of 1970, Willistown Township's zoning ordinance did not provide for apartments. *Girsh Appeal,* 437 Pa. 237, 263 A. 2d 395 (1970), was handed down on February 13, 1970. Willistown Township then amended its zoning ordinance to allow apartments in a specified area containing some 80 acres. This ordinance was adopted finally on August 25, 1970. Immediately prior to final adoption, Chesterdale Farms, Inc. filed for a building permit to build apartments at the location here in question not within the 80 acres. The application was refused and on the same day, August 21, 1970, Chesterdale Farms, Inc. filed to appeal to the Zoning Hearing Board. The Zoning Hearing Board held four hearings, and received 232 pages of testimony and, in addition, 17 exhibits from Chesterdale Farms, Inc., and 16 exhibits from the Township. The Zoning Hearing Board filed a 23-page opinion on March 6, 1971, making 67 findings of fact and nine conclusions of law. Chesterdale Farms, Inc. appealed to the Court of Common Pleas on March 22, 1971. Without taking further testimony, the lower court affirmed all of the findings of the Zoning Hearing Board, specifically affirming the action of the Board in denying Chesterdale Farms, Inc.'s application. The court went on to declare Article X of the amended zoning ordinance unconstitutional and then entered the following

order: "AND NOW, July 9, 1971, the action of the Willistown Township Zoning Board in denying the appellant's application for a variance is denied and further, Article X of the Amended Zoning Ordinance enacted August 25, 1970, is declared to be unconstitutional insofar as it affects the construction of apartment buildings in Willistown Township. Costs to be paid by the appellant." We can only conclude that the word "denied" is an error and should have been the word "affirmed," since, in the body of the opinion, the court stated: "We must, therefore, affirm the action of the Board in denying the appellant's application for a variance."

The lower court treated this case in two parts. First, was Chesterdale Farms, Inc. entitled to the building permit? Second, was Willistown Township's zoning ordinance, as amended, constitutional? On the first question, after considerable discussion, the court not only found that the Zoning Hearing Board had sufficient evidence on which to deny the application, but it affirmatively agreed with it.

"There is no indication that the present owners or the appellant have made the slightest effort or study with a view toward employing the land in accordance with the Township plan and the zoning ordinance. The appellant would have this court dismiss the dictates of the ordinance and the enabling legislation merely because it would be profitable for it to construct apartments." Chesterdale Farms, Inc. did not appeal the decision. Therefore, we do not see how this Court could conclude that the building permit should issue. Surely those who hold a contrary view do not mean that on application, regardless of all other circumstances, anyone can build apartments anywhere in this Township as long as the plan abides by "reasonable setbacks, open space, heights, and other light and air requirements."

We would affirm the lower court's decision to affirm the Board in its denial of the permit.

On the second question, we must disagree with those who would hold that the ordinance, as amended, is unconstitutional. The record will not support a finding that Willistown Board of Supervisors acted in bad faith or attempted a token compliance with *Girsh* when it adopted its amendment on August 25, 1970. The minutes of that meeting are in evidence as Township Exhibit No. 16. The following is an excerpt from those minutes:

"Mr. Reitman, on behalf of the planning commission, then read a letter dated August 25, 1970, from the commission to the board of supervisors describing the long and intensive study and investigation of the planning commission which led to the amendments under consideration, explaining the views of the planning commission on such amendments and recommending passage of the ordinance.

"Mr. Ewing then read from the opinion of the Pennsylvania Supreme Court in Girsch v. Nether Providence Township, observing that the language of that case obliged all townships with a demand for apartments to provide for them. Failure to act, he noted, would only increase the risk that builders could obtain court approval for apartments in areas of their selection. It was therefore important that the township act responsibly to provide a reasonable area for apartment use consistent with the orderly development of the township and furnishing of necessary township services." The minutes are quite detailed with two and a half pages of single-space type. Many people spoke for and against the proposed amendment, including a representative of Chesterdale Farms, Inc.: "John T. Clary, Esquire, attorney and principal of Chesterdale Farms, Inc., suggested that Mr. Reitman had not mentioned, in his let-

ter consulting financial expert. He asserted that it was no use to zone an area for apartments if they were not economically feasible." We see here the only objection made by Chesterdale Farms, Inc. was the cost of land. As indicated in the quote from the lower court's opinion, it was impressed with the fact that the only reason for Chesterdale Farms, Inc. to prefer this area to the zoned area was one of cheap ground. Perhaps this would have some relevance if it were affecting the type housing to be constructed. Here, middle to high income housing would be constructed in any event.

We see no necessity for a lengthy discussion of the economic or sociological basis for *Girsh*. It is the law of this Commonwealth. The sole question here is whether the Township Supervisors, in the proper discharge of their duties, after due consideration and proper inquiry and advice, have reasonably provided for apartments in an appropriate sector of the Township. The extensive record in this case, including the detailed opinion filed by the Zoning Board, supports the decision that the Township officials, after considerable study, including recommendations of county and regional planning bodies, amended its zoning ordinance to permit apartments in an area it found best suited therefor, near the existing population center, convenient to transportation, schools and municipal services, and in keeping with the plans for the long-range development of the Township, but flexible enough to reflect continuing study and adjustment to need.

While certainly reasonable minds might differ, it is a sorry day when duly elected township officials who appear to us to have discharged their duties with the utmost care and diligence, are told that a "most cursory of glances" at this record showed that at best they failed in their duties and at worst, connived to avoid

the dictates of the Supreme Court. We do not imply that the opinion of our associates is based on a most cursory of glances at the record, but we look in vain for support anywhere in the record for an assumption that only 40 of the 80 acres zoned for apartments are available for apartments because the owners will not sell. Indeed, we can only conclude from an examination of the record that the township officials have acted reasonably and have complied with the rule of *Girsh.*

Our associates dwell at length on the Township's duty to accept its "fair share" of the poor, near poor, and perhaps a "substantial segment" of the middle class. (Presumably the emphasis is on the poor and near poor.) The Township's ability to accept its fair share will be impeded rather than assisted if the position of our associates that the building permit should issue prevails, for it is abundantly clear none of these people will benefit from the construction of these 480 apartments, renting for efficiency at $185.00 per month, one bedroom at $200.00, two bedrooms at $265.00, and three bedrooms at $300.00, described by Chesterdale Farms, Inc.'s architect as "middle to high income dwelling."

The decision of the lower court in affirming the denial of the building permit should be affirmed, and its decision that the ordinance is unconstitutional should be reversed.

President Judge BOWMAN and Judge BLATT join in this Opinion.