Hilltown Township, Appellant, *v.* Vernon Horn and Edith Horn, His Wife, Appellees.

Vernon Horn and Edith Horn, His Wife, Appellants, *v.* Hilltown Township, Appellee.

Argued April 2, 1974, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Francis X. Grabowski,* for appellant-appellee, Hilltown Township.

*Charles M. Marshall,* with him *John J. Lombard, Jr., Alan C. Kauffman, Eastburn & Gray* and *Obermayer, Rebmann, Maxwell & Hippel,* for appellants-appellees, Vernon Horn and Edith Horn, his wife.

OPINION BY JUDGE MENCER, June 6, 1974:

Vernon and Edith Horn (Horns) are the owners of a stone quarry in Hilltown Township, Bucks County, which they purchased in 1968. This quarry operation

was begun in 1936. On October 30, 1959, Hilltown Township adopted a zoning ordinance by the terms of which the site of the quarry was zoned R-50, Residential Agricultural, a classification that did not permit quarries. No question is raised, nor could there be on the record, that prior to the enactment of the zoning ordinance an active quarry operation was being conducted and thus became a nonconforming use in the R-50 zone.

On April 5, 1971, the Zoning Officer of Hilltown Township issued a cease-and-desist notice to the Horns, ordering them to cease the operation of the quarry. On April 26, 1971, Hilltown Township filed a complaint in equity in the Court of Common Pleas of Bucks County, requesting an injunction prohibiting the further operation of the quarry. After a series of hearings held in the early fall of 1971, the parties agreed that the dispute should have been submitted to the Zoning Hearing Board of Hilltown Township (Board). Thereupon, the Horns filed an application with the Township Zoning Officer requesting permits for the operation and expansion of the quarry and "a blacktop plant, a crushing operation and office and storage buildings." The application was refused and permits for the operation of the quarry, blacktop plant, and office were denied and Horns filed an appeal with the Board.

The parties stipulated that the record made before the Court of Common Pleas in the equity proceeding should be incorporated as part of the record before the Board. Following two hearings, the Board affirmed the refusal of the Zoning Officer to issue the requested permits. Horns appealed this ruling of the Board to the Court of Common Pleas which reversed that part of the Board's order that prohibited the operation of the quarry and the use of a farmhouse on the property as an office and affirmed the Board's determination that the

operation of the "asphalt plant" on the Horns' premises is in violation of the applicable zoning ordinance.

The Horns and Hilltown Township filed these present cross-appeals and we affirm.

The court below heard no testimony and received no additional evidence. Our function, therefore, is that of determining whether the Zoning Hearing Board abused its discretion or committed an error of law. *Township of Abington v. Rocks Associates, Inc.,* 11 Pa. Commonwealth Ct. 95, 312 A. 2d 98 (1973).

Subsection 5 of Section 1103 of the Hilltown Township zoning ordinance reads: "5. Abandonment. If a non-conforming use of a building or land is voluntarily abandoned and ceases for a continuous period of one (1) year or more, as determined by the board of adjustment, subsequent use of such building or land shall be in conformity with the provisions of the Ordinance."

By the terms of the ordinance, in order to find an abandonment of a nonconforming use, it must be shown that there were both a voluntary abandonment and a cessation of use for a continuous period of one year or more. The burden of proving such an abandonment rests upon the Township. *Haller Baking Company's Appeal,* 295 Pa. 257, 145 A. 77 (1928).

In *Marchese v. Norristown Borough Zoning Board of Adjustment,* 2 Pa. Commonwealth Ct. 84, 95, 277 A. 2d 176, 183 (1971), we stated: "As distinguished from mere discontinuance, the concept of the term 'abandonment' includes the intention to abandon. Consequently, the abandonment of a nonconforming use and the consequent termination of any legal right thereto results from a concurrence of facts, circumstances, and the intention of the owner of the premises or other person entitled to the use. Intention with respect to the abandonment of a nonconforming use is to be ascertained from overt acts, or failure to act, as well as statements.

"Decisions in cases dealing with the effect of the cessation or discontinuance of a nonconforming use naturally turn on the language of the particular ordinance or statute under consideration."

The question of abandonment, being a question of fact, depends on a weighing of all the various factors present in an individual case. The factual differences here and the language of the ordinance compel the result reached here and distinguish this case from *West Mifflin v. Zoning Hearing Board,* 3 Pa. Commonwealth Ct. 485, 284 A. 2d 320 (1971), and *Marchese v. Norristown Borough Zoning Board of Adjustment, supra.* We find insufficient evidence in the record to support the Board's finding of abandonment of the nonconforming quarry operation and, therefore, must conclude that the Board committed an error of law in this regard.

The Court below correctly analyzed the record evidence as indicating an intention to continue rather than abandon the operation of the quarry when it stated:

"Samuel Landis testified that he started working in the quarry in 1921 and continued to work there up until the present time with the exception of approximately one year, 1924, when he was in the hospital. He worked there under the four owners heretofore enumerated. It was his testimony that since 1921 there was no year in which the quarry wasn't operated. There was no year in which the quarry did not crush stone, did not drill, and no year during which there was no digging or excavating, pumping of water, sale of material or blasting. He testified that during the years 1963 to 1967 he kept the books and records of the quarry operation. He testified that he made deliveries of stone from the quarry every year up until 1967 when [Horns] acquired the property. He testified that the east quarry, the one in question before us, was opened in 1935 and 1936 and used continuously to the present time. From 1963 to 1967 he testified that he operated the stone

crusher at least one day per year and that he blasted. There is no doubt that Landis was in fact employed at the quarry during this entire period of time and just about every witness who had any familiarity with the quarry at all, regardless of which side they purported to support, testified that Landis was employed there during the entire period.

"Oplinger testified that he operated the quarry and crusher from 1963 to 1967 and quite frankly admitted he did it in order to keep the quarry operational so as to retain his nonconforming use. He testified quite clearly that he intended to keep the quarry open and sufficiently operational to retain its use.

"There was no evidence offered in contravention of the foregoing. Many witnesses testified that they never observed any quarrying operations on the premises, but most of them frankly admitted that they were not on the premises but only passed it by travelling on the road. Additionally, considering the limited nature of the operation, it is not surprising that most people would not have observed its taking place. However, the fact that it was limited in nature does not necessarily indicate that it was nonexistent. . . . The limited quarry operation as testified to by Landis and Oplinger, and as uncontroverted, clearly indicates the lack of intention to abandon. There was testimony from a number of witnesses that during the period in question they purchased stone at the quarry. The mere fact that most of that stone may have been brought from another quarry and deposited here for sale is likewise not inconsistent with the operation of a quarry. We do not suppose that a quarrying operation requires that all products sold therefrom must necessarily have been quarried there. The sale of stone from this quarry, even though brought there from another quarry, is consistent with and some evidence of the continuation of a quarrying operation at this premises. In addition, at least one

witness testified that he went to the quarry during the period in question and removed some stripping for fill purposes from the quarry itself. Landis testified that there was some drilling and crushing and that the product of that drilling and crushing was likewise sold."

Likewise, the Board committed error in concluding that the use of the farmhouse on the premises as an office for the quarry operation did not constitute a nonconforming use. We are satisfied that the court below fairly and correctly summarized the evidence on this question when he succinctly wrote: "Landis testified that he kept all of the books and records of the quarry operation and that he and his family lived in this farmhouse from 1963 until December of 1970. He testified that there was an office in the house in 1921 when he first became employed at the quarry and that there was no other office at that time. He testified that the books, records, cash deposits were kept and ordering of materials and supplies were done in the house. He testified that there was also a scale house where slips were put every night but that they were all later taken to the house and that all business was conducted from the house. He testified that there was a desk in the living room at that time and that all of the foregoing continued during the entire time that he was employed at the quarry. Other witnesses testified that they sometimes did business with Landis from the house. Oplinger testified that although there was an office in the scale house and there was no office, as such, in the house, he did not contradict the fact that Landis conducted the bulk of the quarry business from the house itself. Based upon the foregoing evidence we are satisfied that the record amply supports the fact that the house, or at least a portion of it, was used as an office for the quarry and therefore its use was a nonconforming one as part of the totality of the quarry operation."

Further, we are in accord with the court below that this record establishes that the use of the premises for asphalt production was not a nonconforming use and that this aspect of the case is controlled by *Mignatti Appeal,* 403 Pa. 144, 168 A. 2d 567 (1961), rather than by *Miller Co., Inc.'s Zoning Appeal,* 3 Pa. Commonwealth Ct. 213, 281 A. 2d 364 (1971).

Here, as in *Mignatti,* the blacktop or asphalt operation is severable and is an independent process from the operation of quarrying and stone crushing and not an integral part thereof. In *Miller,* the property owner had previously obtained a court determination that the site was in continuous use as a stone quarry business, a road-building business, and a retail business for selling quarried mineral products used in making concrete and in paving roads and parking lots. We decided only that, in view of this previous determination, the bituminous concrete plant had become an integral part of the quarry operation, that it was an existing nonconforming use, and that it would not be a new use of the land.

Horns do not propose to discontinue one nonconforming use and substitute another but rather wish to expand the allowable nonconforming use—quarrying—and add a second nonconforming use; namely, a blacktop or asphalt plant. In *Horninger v. Bethlehem Township Police Association,* 8 Pa. Commonwealth Ct. 85, 301 A. 2d 433 (1973), interpreting an ordinance provision comparable to the provision applicable here,[1] we

---

[1] The applicable portion of Section 1103(3) of the Hilltown ordinance states: "3. Changes. A non-conforming use of a building or land may be changed to a non-conforming use of the same or more restricted classification, if no structural changes or alterations are made therein, provided that such change may include structural changes or alterations when authorized as a special exception." The applicable ordinance provision in *Horninger v. Bethlehem Township Police Association, supra,* reads: " 'Any nonconforming

held that one engaged in a nonconforming use of land may change that use to another by discontinuing the first and substituting the second, but he may not continue the first on a part of his land without change and erect an additional use incompatible with the requirements of the ordinance.

Two additional and serious questions are raised in these appeals. Horns, on appeal from the Board's order to the court below, contended that "[t]he Hilltown Township Zoning Ordinance is unconstitutional and is not a valid exercise of the police power since its effect is to prohibit quarry operations anywhere in the Township." Since we affirm the right of the Horns to continue their quarry operations, we deem the question of the constitutionality of the zoning ordinance to be moot, and therefore we do not reach the difficult considerations flowing from *Concord Township Appeal,* 439 Pa. 466, 268 A. 2d 765 (1970), and *Girsh Appeal,* 437 Pa. 237, 263 A. 2d 395 (1970). *See Willistown Township v. Chesterdale Farms, Inc.,* 7 Pa. Commonwealth Ct. 453, 300 A. 2d 107 (1973). The question of whether or not the Hilltown Township ordinance is unconstitutional as being exclusionary relative to blacktop or asphalt plants was not raised by the Horns in their appeal from the Board's order to the court below and therefore we cannot consider it properly raised in this appeal, even though a constitutional issue is involved. *Commonwealth v. Robinson,* 7 Pa. Commonwealth Ct. 521, 300 A. 2d 913 (1973).

---

principal and/or accessory use of a principal and/or accessory conforming or nonconforming structure and/or land may be changed to another nonconforming new principal and/or accessory use, provided the new principal and/or accessory use shall be a permitted use in the Zoning District in which the existing principal and/or accessory nonconforming uses are permitted uses or more restricted uses.' " 8 Pa. Commonwealth Ct. at 87, 301 A. 2d at 435. (Emphasis omitted.)

Horns also assert that they were denied due process by the fact that the solicitor who represented the Board also represented Hilltown Township in its equity suit by which it sought to enjoin Horns' quarry and asphalt operations. We held in *Ironstone Corporation v. Zoning Hearing Board,* 5 Pa. Commonwealth Ct. 420, 291 A. 2d 310 (1972), that, absent a showing of actual harm to a party, the fact that the same solicitor represented a township zoning hearing board in a hearing upon an application for a special exception and acted for the township in a prior action against the applicant for using his property in violation of the ordinance is not in itself a denial of due process. Our examination of the record does not convince us that the Board was improperly influenced by its solicitor. Although, we, in *Limekiln Golf Course, Inc. v. Zoning Board of Adjustment of Horsham Township,* 1 Pa. Commonwealth Ct. 499, 275 A. 2d 896 (1971), disapproved the practice of counsel's serving both an interested municipality and the zoning board, we did not hold that such practice is, without more, a denial of due process. We are not on this record persuaded to remand. *See Cherbel Realty Corporation v. Zoning Hearing Board,* 4 Pa. Commonwealth Ct. 137, 285 A. 2d 905 (1972).

Order affirmed.